[No. D040854. Fourth Dist., Div. One. Feb. 25, 2004.]

THE PEOPLE ex rel. BILL LOCKYER, as Attorney General, etc., Plaintiff and Respondent, v.
R.J. REYNOLDS TOBACCO COMPANY, Defendant and Appellant.

1254

**COUNSEL**

Paul, Weiss, Rifkind, Wharton & Garrison, Jeh Charles Johnson, Marc Falcone, Paul H. Cohen, Amelia A. Cottrell; Howard, Rice, Nemerovski, Canady, Falk & Rabkin and H. Joseph Escher III for Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Dennis Eckhart, Assistant Attorney General, Laura Kaplan, Alan Lieberman and Karen Leaf, Deputy Attorneys General, for Plaintiff and Respondent.

G. Steven Rowe, Attorney General (Maine), Melissa Reynolds O'Dea, Assistant Attorney General; Christine O. Gregoire, Attorney General (Washington), and David M. Horn, Assistant Attorney General, for 38 states, the District of Columbia and Puerto Rico as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**McDONALD, J.**—Defendant R.J. Reynolds Tobacco Company (Reynolds) appeals a judgment in favor of plaintiff the People of the State of California on the People's complaint for an enforcement order of a consent decree (Consent Decree) entered on a master settlement agreement (MSA). Reynolds contends the court erred by (1) concluding Reynolds violated an MSA provision incorporated into the Consent Decree prohibiting Reynolds from targeting youth in its print advertising of tobacco products, (2) issuing an impermissibly vague injunction, and (3) imposing $20 million in sanctions on Reynolds. We reverse the imposition of sanctions and otherwise affirm the judgment.

I

INTRODUCTION

We state the facts and reasonable inferences drawn from the evidence most favorably to the People as the party prevailing at trial. (*Hasson v. Ford Motor*

*Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857], disapproved on another point in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 581 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631]; *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1243, fn. 2 [62 Cal.Rptr.2d 298].)

"Tobacco manufacturer Reynolds promoted its tobacco products in California." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520 [132 Cal.Rptr.2d 151], fn. omitted (*Lockyer*).) In doing so, Reynolds and its media planner developed plans for advertising its products in print media, including magazines. Reynolds's media plans identified the magazines in which to place advertisements, formed its magazine approval policy and created media advertising schedules[1] by reference to survey data measuring magazine readership collected and analyzed by national research services, MediaMark Research Inc. (MRI) and, to a lesser extent, Simmons Market Research Bureau (Simmons). MRI's data do not show how many people have seen an advertisement in a magazine but instead simply quantify the people who read or looked at an issue of the magazine. Young adult smokers age 21 to 34 were generally the stated target of Reynolds's magazine tobacco advertising.

"In November 1998 Reynolds and the People signed the MSA that settled the People's litigation against various tobacco product manufacturers, including Reynolds." (*Lockyer*, *supra*, 107 Cal.App.4th at p. 520, fn. omitted.) "Further, the parties stipulated to entry of a consent decree and final judgment. As part of the consent decree, the Superior Court of San Diego County approved the MSA (*People v. Philip Morris, Inc.* (1998, No. JCCP4041) [and] retained exclusive jurisdiction for purposes of implementing and enforcing the MSA." (*Lockyer*, at p. 520.)

"The MSA placed . . . detailed express restrictions on Reynolds's advertising and marketing practices." (*Lockyer*, *supra*, 107 Cal.App.3d at p. 520.) MSA, subsection III(a), entitled "Prohibition on Youth Targeting," provided: "No Participating Manufacturer may take any action, directly or indirectly, to target Youth within any Settling State [including California] in the advertising, promotion or marketing of Tobacco Products . . . ."[2] Consent Decree, section V(A) permanently enjoined Reynolds from "[t]aking any action,

---

[1] A media advertising schedule is a list of magazines and the number of issues in which an advertisement is to appear in a magazine during a defined period of time.

[2] MSA, subsection II(bbb) defined "Youth" as "any person or persons under 18 years of age." Our opinion uses the word "youth" to mean persons age 12 through 17.

directly or indirectly, to target Youth within the State of California in the advertising, promotion or marketing of Tobacco Products . . . ."

The People's litigation settled under the MSA included allegations that Reynolds had targeted its advertising to youth. However, after entering into the MSA, Reynolds initially made no changes to its media advertising schedules, did not include in its media plans the goal of reducing exposure of its advertising to youth and did not determine the extent its advertising was exposed to youth. Although Reynolds eventually made changes to its media advertising schedules, those changes had minimal impact in reducing exposure of its advertising to youth. After the MSA was signed, Reynolds was more likely to advertise in magazines known to have a higher level of exposure to youth than before the MSA was signed. After the MSA was signed, Reynolds's print media advertising policy did not significantly avoid exposure of its advertising to youth.

Although the MSA was signed in 1998, during 1999 through 2001 Reynolds's tobacco print advertising was exposed to youth at levels virtually identical to the levels of its targeted group of young adult smokers. Those comparable exposures suggested Reynolds's print advertising was aimed at two audiences. If Reynolds had been aiming exclusively at young adult smokers, the exposure of its advertising to that group would have been higher than to youth. Because the MRI and Simmons data were available to Reynolds, Reynolds could have reasonably anticipated the comparable exposures of its print advertising to young adult smokers and youth. Alternative advertising strategies were available to Reynolds. Reynolds could have modified its existing advertising policies and practices and created alternative media advertising schedules to reduce the exposure of magazines containing Reynolds's advertising to youth while retaining a reasonably good exposure to young adult smokers. The advertiser's selection of the magazines and the number of advertising insertions into those magazines determine the number of people exposed to the advertising within and outside the stated target group. An advertiser can target specific smoker demographic groups by selecting the magazines into which its advertisements are placed. The key to reducing advertising exposure to youth without a commensurate reduction in exposure to adult smokers is to select magazines with high adult-smoker-to-youth audience ratios and magazines with audiences containing a low composition of youth. Further, advertising in numerous magazines results in a cumulative effect of advertising exposure to youth. Reynolds could have reduced the number of magazines in which it advertised to avoid those with a high youth audience while continuing its advertising exposure to young adult smokers. Although Reynolds was aware it could adopt media advertising schedules less likely to expose its advertising to a high number of youth while maintaining a strong exposure of its advertising to young adult smokers, it chose not to do so.

A dispute arose between the parties about whether Reynolds was complying with subsection III(a) of the MSA and section V(A) of the Consent Decree. The People demanded that Reynolds modify its advertising practices. Communications between the parties did not resolve the matter, and in March 2001 the People filed this lawsuit alleging Reynolds violated the MSA and Consent Decree by targeting youth through placement of its tobacco advertisements in national consumer magazines in the years 1999, 2000 and 2001.[3] The People's lawsuit sought enforcement of the MSA and Consent Decree and sanctions for Reynolds's alleged violation of the Consent Decree provisions prohibiting the targeting of tobacco advertising to youth.

Before and during trial, Reynolds moved to exclude evidence of MRI's survey data, including its teenage audience data. Reynolds also moved to preclude the People's experts from offering opinion testimony based on those data. At trial, the parties litigated the accuracy and admissibility of MRI's data. The trial court overruled Reynolds's foundational objections to evidence of those data, concluding the People established an adequate foundation for admissibility of that evidence.

The trial court found that after "the MSA was signed, [Reynolds] . . . exposed Youth to its tobacco advertising at levels very similar to those of targeted groups of adult smokers." The court also found that between 1997 and 2001, "the delivery of print media advertising by [Reynolds] to its stated target audience of young adult smokers and to Youth age 12 to 17 is essentially the same." Based on those findings, the court concluded Reynolds violated the MSA and Consent Decree's prohibition against targeting youth. The court entered judgment permanently enjoining Reynolds from continuing to violate MSA, subsection III(a) and Consent Decree, section V(A) "by exposing Youth to its tobacco advertising at levels similar to the levels of exposure of adult smokers." The judgment also ordered Reynolds to (1) adopt reasonable measures designed to reduce exposure of its advertising to youth to a level significantly lower than the exposure level of its advertising to its stated target of young adult smokers, and (2) use reliable means such as the MRI and Simmons data to measure and demonstrate whether Reynolds was achieving success toward that goal. Further, based on the Consent Decree's provisions authorizing sanctions, the court awarded the People $20 million sanctions against Reynolds.

---

[3] On the same day the People filed this lawsuit, Reynolds announced a policy limiting its advertising to magazines with an exposure to youth of less than 25 percent as measured by the MRI or Simmons data. Reynolds's press release of that day stated "[o]ur advertising policy fulfills the intent and spirit of the MSA by dramatically reducing advertising exposure among minors, while allowing limited communication with adult smokers"; and "we believe our policy is a responsible way to minimize the number of cigarette ads minors may see in magazines." However, despite Reynolds's newly announced policy, the exposure of magazines containing Reynolds's advertising to youth insignificantly declined.

Reynolds appeals the judgment, contending the trial court reversibly erred by concluding Reynolds violated MSA, subsection III(a) and Consent Decree, section V(A) by targeting tobacco advertising to youth within California. Reynolds also contends the court reversibly erred by imposing a $20 million sanction without the requisite specific findings or any basis in the record.

## II

## DISCUSSION

## A

### *MSA's Provision Prohibiting the Targeting of Advertising to Youth*

Reynolds contends that the trial court improperly concluded the People met their burden to prove Reynolds violated MSA, subsection III(a) and Consent Decree, section V(A) by targeting its tobacco advertising to youth within California. Reynolds argues the court prejudicially erred by: (1) in effect rewriting subsection III(a) to eliminate the requirement that Reynolds have the purpose or intent to expose its advertising to youth; (2) violating Reynolds's due process rights by restricting Reynolds's First Amendment right to advertise to adult smokers; (3) issuing an impermissibly vague injunction; (4) admitting hearsay evidence of survey data of magazine readership for its truth and permitting the People's experts to offer opinions based on those data; (5) entering judgment against Reynolds although the evidence did not show any violation of MSA, subsection III(a) occurred within California; and (6) making findings and reaching conclusions about Reynolds's competitors Philip Morris and Brown & Williamson (B&W) based on inadmissible hearsay evidence.

## 1

### *Interpretation of MSA's Provision Prohibiting Reynolds from Targeting Youth*

The parties dispute the meaning of MSA, subsection III(a) that provides Reynolds may not "take any action, directly or indirectly, to target Youth" in its advertising, promotion or marketing of tobacco products. The trial court interpreted that provision of the MSA to preclude Reynolds from "taking any action that exposes Youth to tobacco advertisement to virtually the same degree as if Youth had been directly targeted." In arriving at that interpretation, the court stated it did not matter whether Reynolds "had any purpose or primary purpose to increase the incidence of Youth smoking in designing and

implementing its advertising campaign." The court characterized subsection III(a) as prohibiting targeting youth "regardless of purpose or intent." The court also stated subsection III(a)'s term "indirectly" referred to "any tobacco advertising actions that result in Youth exposure to virtually the same degree as if Youth had been directly targeted." Applying its interpretation of subsection III(a) to the evidence adduced at trial, the court concluded Reynolds violated the MSA "by indirectly targeting Youth in its tobacco advertising."

Reynolds contends the trial court erroneously transformed Reynolds's obligation under MSA, subsection III(a) by rewriting that contractual provision (1) to delete as a material element of a violation of the provision any requirement that Reynolds have the purpose or intent to expose its advertising to youths, and (2) to impose on Reynolds not simply a prohibition on targeting youth but rather an enormous and ill-defined affirmative obligation to avoid or reduce the levels of exposure of its tobacco advertising to youth. Because the court's interpretation of subsection III(a) does not turn on the credibility of extrinsic evidence, we exercise de novo review of that interpretation. (*Lockyer, supra,* 107 Cal.App.4th at p. 520; *Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843 [102 Cal.Rptr.2d 468]; *Campbell v. Scripps Bank* (2000) 78 Cal.App.4th 1328, 1336 [93 Cal.Rptr.2d 635]; *Centex Golden Construction Co. v. Dale Tile Co.* (2000) 78 Cal.App.4th 992, 996 [93 Cal.Rptr.2d 259]; *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 504 [61 Cal.Rptr.2d 668]; *Foothill Properties v. Lyon/Copley Corona Associates* (1996) 46 Cal.App.4th 1542, 1549 [54 Cal.Rptr.2d 488]; *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 22 [31 Cal.Rptr.2d 378].)

■ We depart from the trial court's interpretation of MSA, subsection III(a), and conclude that intent is a material element that must be proven to establish a violation of that contractual provision. Our interpretation of subsection III(a) to include an element of intent is consistent with the compromise struck by the parties in the MSA[4] and avoids any alleged unconstitutionality in the trial court's interpretation. However, under our interpretation of subsection III(a), Reynolds has not demonstrated that any

---

[4] In construing MSA, subsection III(a), we give no weight to the MSA's recitals relied on by the People. (*Lockyer, supra,* 107 Cal.App.4th at p. 524.) In *Lockyer* we declined to "apply the People's proffered analysis based on the theory that the overall general intent of the MSA was to reduce youth smoking and promote public health." (*Ibid.*) In doing so, we noted: "Though the parties' pleadings acknowledged that the MSA's stated goals included reduction of youth smoking and promotion of public health, the MSA was fundamentally a means of settling litigation by striking a balance between competing interests." (*Ibid.*) The parties expressly agreed that although Reynolds's print advertising targeting youth would be prohibited, some print advertising to Reynolds's stated target of adult smokers would nonetheless be allowed even if the advertising also reached youth.

error in the trial court's interpretation was prejudicial in this case. (Code Civ. Proc., § 475;[5] *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

▉ The trial court's analysis was incorrect to the extent it interpreted MSA subsection III(a)'s prohibition against targeting youth as not including the element of intent. Words in a contract are given their ordinary meanings absent evidence the parties intended to use those words in a different sense. (*Moss Dev. Co. v. Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].) To determine a word's "common meaning, a court typically looks to dictionaries." (*Consumer Advocacy Group, Inc. v. Exxon Mobil Corp.* (2002) 104 Cal.App.4th 438, 444 [128 Cal.Rptr.2d 454]; *Tellis v. Contractors' State License Bd.* (2000) 79 Cal.App.4th 153, 163 [93 Cal.Rptr.2d 734]; *Blasiar, Inc. v. Fireman's Fund Insurance Co.* (1999) 76 Cal.App.4th 748, 754 [90 Cal.Rptr.2d 374].) " 'The "clear and explicit" meaning of [a contract's words construed] in their "ordinary and popular sense" . . . [generally] controls "judicial interpretation" ' " unless the parties used the words in a technical sense or special meaning was given to the words by usage. (*Blasiar*, at p. 754, citing *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

The common and ordinary meaning of the word "target" as defined in various dictionaries incorporates the concept of a direct purposeful intent to reach a particular goal. (Random House Dict. (2d ed. 1993) p. 1944; Webster's 3d New Internat. Dict. (1993) p. 2341.)[6] Indeed, some dictionary definitions expressly include the phrase "to direct toward a target." (See, e.g., Webster's 3d New Internat. Dict., *supra*, p. 2341; Random House Dict., *supra*, p. 1944.) Considering the common meaning of the word "target," the trial court erred to the extent it interpreted MSA, subsection III(a) as prohibiting "indirect" targeting. The trial court also erred to the extent it concluded the People were not required to prove Reynolds had the intent to target youth. As Reynolds observes, one "cannot 'target' something without intending to do so." The People's opening brief acknowledges that a scienter element is inherent in the word "target" and, in opposing Reynolds's motion for judgment under section 631.8, the People told the trial court they were not proceeding on the theory that targeting was devoid of any element of intent.

[5] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[6] Media research consultant Gray testified that, as used in the media research industry, targeting has an intentional component (intent and selection) and an empirical component (results and achievement of the intent). However, for purposes of proving a violation of MSA, subsection III(a), our interpretation of the word "targeting" does not depend on evidence of the trade meaning of that word. (§ 1856, subd. (c); *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 853 [89 Cal.Rptr.2d 540]; *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240 [88 Cal.Rptr.2d 777]; *Hayter Trucking, Inc. v. Shell Western E & P, Inc.* (1993) 18 Cal.App.4th 1, 15–16 [22 Cal.Rptr.2d 229].)

The People acknowledged intent was not irrelevant to the question of targeting, but argued intent was "not limited to primary purpose or exclusive purpose or anything of that character."

The dispositive issue with respect to interpretation of MSA, subsection III(a) is not whether targeting can be *indirect*, because the common meaning of the word "target" excludes indirect results. (*Tellis v. Contractors' State License Bd.*, *supra*, 79 Cal.App.4th at p. 163; *Blasiar, Inc. v. Fireman's Fund Ins. Co.*, *supra*, 76 Cal.App.4th at p. 754.) Instead, considering the element of scienter inherent in the word "target," the dispositive issue is whether the People proved by substantial evidence that Reynolds violated subsection III(a) by intentionally targeting youth in its advertising. (Cf. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 172 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).)

In *Cel-Tech*, *supra*, 20 Cal.4th 163, the Supreme Court observed: "We have said that ' "intent," in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct.' " (*Id.* at p. 172; cf. *Estate of Kramme* (1978) 20 Cal.3d 567, 572–573 [143 Cal.Rptr. 542, 573 P.2d 1369] (*Kramme*) ["[f]or a result to be caused 'intentionally,' the actor must either desire the result or know, to a substantial certainty, that the result will occur"]; *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 & fn. 10 [114 Cal.Rptr. 622, 523 P.2d 662] (*Schroeder*).) Although *Cel-Tech* discussed the concept of intent in the context of tort law, we conclude that the concept is equally applicable to the required intent implicit in MSA, subsection III(a)'s prohibition against targeting youth. If Reynolds intended its print advertising to target young adults but knew to a substantial certainty it would be exposed to youth to the same extent as young adults, then as a matter of law, Reynolds is deemed to have intended to expose, and thus targeted, youth as well as young adults.

The trial court concluded that although Reynolds had access to data showing that the level of exposure of its advertising to youth was about the same as exposure to the targeted young adult smokers, Reynolds "studiously avoided" measuring its advertising exposure to youth or comparing exposure to youth with exposure to young adults, probably because Reynolds "knew the likely result of such analysis." The court also found that Reynolds "willingly engaged in an aggressive print advertising campaign to maximize exposure to targeted groups such as Young adult smokers, simply choosing to ignore the foreseeable consequence of significant Youth exposure." The court further stated, "it is reasonable to conclude that [Reynolds], even without examining all the data it had at its disposal, realized or should have realized that it was reaching Youth at levels at least as great as adults in its print advertising . . . ." Further, as Reynolds acknowledged in seeking judgment under section 631.8, "intent can always be proved through circumstantial

evidence" if such evidence is "reliable."[7] MRI's magazine exposure results and derivative data constituted circumstantial evidence of Reynolds's intent to target youth. The trial court acted within its discretion in overruling Reynolds's objections that the circumstantial evidence was not reliable. We conclude the record contained substantial evidence that Reynolds violated MSA, subsection III(a) by targeting youth because Reynolds knew to a substantial certainty that its advertising was exposed to youth to the same extent it was exposed to young adults. (*Cel-Tech, supra,* 20 Cal.4th at p. 172; *Kramme, supra,* 20 Cal.3d at pp. 572–573; *Schroeder, supra,* 11 Cal.3d at p. 922 & fn. 10.)

2

*Constitutionality of MSA Interpretation and Injunctive
Portions of Judgment*

The MSA imposed a variety of express prohibitions and restrictions on Reynolds's marketing and advertising practices while otherwise preserving Reynolds's commercial speech rights to advertise in the print media to adult smokers. (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 564, 571 [150 L.Ed.2d 532, 121 S.Ct. 2404] (*Lorillard*);[8] cf. *Lockyer, supra,* 107 Cal.App.4th at pp. 531–532.) Reynolds asserts it has constitutional free speech and due process rights to target its advertising to young adult smokers even if the advertising resulted in "incidental" exposure to youth, and the trial court violated its rights by issuing an injunction that requires Reynolds to reduce its advertisements to its stated target of young adult smokers. Reynolds asserts that by requiring Reynolds to avoid exposing its tobacco advertising to youth at levels similar to its advertising's exposure to its stated target of young adults, the court's interpretation of MSA, subsection III(a), and the injunctive portions of the court's judgment, imposed obligations on Reynolds beyond those to which it expressly agreed in the MSA. (*Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 58–59 [92 Cal.Rptr.2d 597] (*Vons*).)[9] Reynolds contends the issue is whether MSA, subsection III(a) imposed an affirmative obligation on Reynolds to limit

---

[7] In its reply brief, Reynolds acknowledges that "where direct evidence is not available to establish" an intent element, "courts accept circumstantial evidence as a potent means of proof."

[8] The First Amendment to the United States Constitution "constrains state efforts to limit advertising of tobacco products, because so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information." (*Lorillard, supra,* 533 U.S. at p. 571.)

[9] "A contract extends only to those things . . . it appears the parties intended to contract. Our function is to determine what, in terms and substance, is contained in the contract, not to insert what has been omitted. We do not have the power to create for the parties a contract that they

incidental advertising exposure to youth that is targeted solely at adults. Reynolds characterizes as undisputed its constitutional right to communicate information through advertising to adults despite incidental exposure of the advertising to youth. However, this case does not involve incidental exposure of Reynolds's advertising to youth. Instead, the case involves Reynolds's intentional exposure of its advertising to youth because Reynolds knew to a substantial certainty its advertising was exposed to youth to virtually the same extent it was exposed to young adults.

Although Reynolds acknowledges that in the MSA it waived any claims that the MSA was unconstitutional, it contends it did so only to the extent that the MSA contained restrictions, limitations or obligations expressly agreed to in the MSA or the Consent Decree.[10] Reynolds characterizes the trial court's construction of MSA, subsection III(a) and the language of the permanent injunction as not simply prohibiting targeting youth but instead imposing an enormous and ill-defined affirmative obligation on Reynolds to avoid or reduce the levels of exposure of its advertising to youth, an obligation to which it did not agree. Reynolds asserts the record contains no basis for a finding that it clearly and compellingly intended to relinquish its constitutional rights, and concludes the MSA should be construed to preserve its constitutional rights and against a waiver of those rights. (*City of Glendale v. George* (1989) 208 Cal.App.3d 1394, 1397–1398, 1405 [256 Cal.Rptr. 742].) However, our independent interpretation of MSA, subsection III(a)'s prohibition against targeting youth differs from the interpretation of the trial court. We agree with Reynolds that proof of a violation of subsection III(a) or the Consent Degree requires a showing Reynolds intentionally targeted youth in its print advertising. Our interpretation of subsection III(a) is consistent with the restrictions, limitations and obligations Reynolds expressly assumed under the MSA and Consent Decree. Moreover, the language in the trial court's interpretation of MSA, subsection III(a) and in the permanent injunction, precluding Reynolds from exposing its tobacco advertising to youth at levels similar to its exposure to adult smokers, did not expand the prohibition to which Reynolds agreed in that subsection.

---

did not make and cannot insert language that one party now wishes were there." (*Vons, supra,* 78 Cal.App.4th at pp. 58–59.)

[10] MSA section XV provided in relevant part: "Each Participating Manufacturer further acknowledges that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it (and the Tobacco-Related Organizations (or any trade associations formed or controlled by any Participating Manufacturer)) waives for purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions. Provided, however, that nothing in the foregoing shall constitute a waiver as to the entry of any court order (or any interpretation thereof) that would operate to limit the exercise of any constitutional right except to the extent of the restrictions, limitations or obligations expressly agreed to in this Agreement or the Consent Decree."

Instead, the trial court simply set forth a means to measure the existence of prohibited youth targeting on this factual record and on a subsequent alleged violation of the prohibition. The record contains substantial evidence that an advertising vehicle's exposure is the standard for evaluating the ability to reach a target audience. The evidence also suggests the way to avoid targeting a particular group is to minimize exposure of the advertising to that group.[11] As observed by the People, subsection III(a)'s prohibition on youth targeting "*is* a limitation on Youth exposure." The record contains evidence that Reynolds could implement alternative advertising schedules using different magazines to avoid targeting youth while maintaining effective targeting of young adult smokers. Reynolds's constitutional challenge to the injunction's language is barred by Reynolds's voluntary waiver set forth in MSA section XV. (*D.H. Overmyer Co. v. Frick Co.* (1972) 405 U.S. 174, 184–188 [31 L.Ed.2d 124, 92 S.Ct. 775]; *Lockyer, supra,* 107 Cal.App.4th at p. 533 [132 Cal.Rptr.2d 151] cf. *Newton v. Rumery* (1987) 480 U.S. 386, 397–398 [94 L.Ed.2d 405, 107 S.Ct. 1187].)

In any event, in exercising de novo review of the language of the permanent injunction entered by the trial court, we are not persuaded by Reynolds's contention that on its face the injunction is impermissibly vague, incomplete, indeterminate, imprecise or overbroad. (*San Diego Unified Port Dist. v. U.S. Citizens Patrol* (1998) 63 Cal.App.4th 964, 969 [74 Cal.Rptr.2d 364]; cf. *Schmidt v. Lessard* (1974) 414 U.S. 473, 476 [38 L.Ed.2d 661, 94 S.Ct. 713] ["basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed"]; *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach* (1993) 14 Cal.App.4th 312, 329 [17 Cal.Rptr.2d 861]; *Ketchens v. Reiner* (1987) 194 Cal.App.3d 470, 476–477 [239 Cal.Rptr. 549]; *City of Indio v. Arroyo* (1983) 143 Cal.App.3d 151, 157 [191 Cal.Rptr. 565]; *Foti v. City of Menlo Park* (9th Cir. 1998) 146 F.3d 629, 638.) Reynolds faults the trial court for not providing definition or guidance about the meaning of various operative provisions in the injunction, and contends it must guess at the meaning of the injunction's provisions prohibiting Reynolds from exposing its advertising to youth *at levels similar to* the exposure to adult smokers and requiring Reynolds to employ *reasonable measures* in its media planning to demonstrate that the level of exposure of its advertising to youth is *significantly less* than the level of exposure of its advertising to targeted groups of adult smokers. (*Pitchess v. Superior Court* (1969) 2 Cal.App.3d 644, 651 [83 Cal.Rptr. 35].) However, the language of the

---

[11] 1 We note that in an August 2001 press release, Reynolds stated: Reynolds believed its "advertising policy is a responsible way to minimize the number of cigarette ads that minors may see in magazines"; Reynolds was "committed to complying with both the letter and spirit of the MSA" and "confident [its] cigarette advertising and marketing fully comply"; and "[t]he MSA was designed to further limit minors' exposure to cigarette advertising—which has happened—while still allowing limited opportunities to compete for adult smokers' business."

injunction gives Reynolds adequate notice of what it "may and may not do." (*Brunton v. Superior Court* (1942) 20 Cal.2d 202, 205 [124 P.2d 831]; *Schmidt*, at p. 476.)

The evidence from which we conclude Reynolds was substantially certain its tobacco advertising was exposed to youth as a targeted audience includes the MRI data showing exposure or reach to the admitted target audience of young adults was essentially the same as to youth. In 1999 exposure to youth was 97.1 percent and exposure to adults was 97.9 percent; in 2000 exposure to youth was 95.2 percent and to adults 96.3 percent. Evidence at trial suggested the methods by which the percentage exposure to youth could be reduced without a comparable reduction in exposure to young adults. Implementation of these methods would be the reasonable measures required by the injunction and the resulting reduction in advertising exposure to youth compared to exposure to young adults would be the significant reduction in exposure to youth required by the injunction.

The permanent injunction contained mandatory provisions ordering Reynolds to "adopt, adhere to, and incorporate as part of its media strategy reasonable measures designed to reduce Youth exposure to its tobacco advertising to a level significantly lower than the level of exposure of targeted groups of adult smokers" and "employ reliable means such as MRI and Simmons data to measure its success in achieving this goal to demonstrate that the exposure of Youth to Reynolds's tobacco advertising is significantly less than the exposure of targeted groups of adult smokers." The mandatory provisions of the injunction do not shift to Reynolds the burden of proof on the issue of prohibited youth targeting. Instead, those mandatory provisions provide Reynolds with means to demonstrate compliance with MSA, subsection III(a)'s prohibition against targeting youth. The burden to prove a violation of that subsection remains with the People, who must show that Reynolds knew with substantial certainty that its print advertising exposure to youth would be the same as its exposure to young adults.

■ Because of our interpretation of MSA, subsection III(a) and the permanent injunction, Reynolds has not established reversible prejudice resulting from any constitutional error by the trial court involving the language of those contractual and remedial provisions. Because the injunction's language is not unconstitutionally vague, we conclude the court acted within its discretion by issuing the injunction. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58]; *Shapiro v. San Diego City Council, supra*, 96 Cal.App.4th at p. 912.)

3

*Admissibility of Evidence of Survey Data Measuring*
*Magazine Readership*

Based on MRI's data, the trial court found: In the year 1999, magazines containing Reynolds's advertising were exposed to 97.1 percent of youth and 97.9 percent of adults; and in the year 2000, magazines containing Reynolds's advertising were exposed to 95.2 percent of youth and 96.3 percent of adults. From those findings, the court concluded the levels of exposure of Reynolds's advertising to youth and adults were "essentially the same."

Reynolds characterizes MRI's data as forming the entire basis for the People's case that Reynolds violated MSA, subsection III(a) by targeting youth and the trial court's conclusion about the comparable levels of exposure of Reynolds's advertising to youth and adults. Reynolds asserts the trial court's decision "rises and falls" on the "accuracy and reliability" of MRI's data. Reynolds contends MRI's data, especially its youth data, was inadmissible hearsay, unreliable and produced overstated and erratic results. It contends the court abused its discretion by admitting those data for their truth (Evid. Code, § 1340) and as the basis of the testimony of the People's experts (*id.*, § 801, subd. (b)) without the requisite foundational showing by the People.

MRI's data were based on a survey. A survey conducted to record the recollections of survey respondents is hearsay. (*Luque v. McLean* (1972) 8 Cal.3d 136, 147–148 [104 Cal.Rptr. 443, 501 P.2d 1163]; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524–1526 [3 Cal.Rptr.2d 833] (*Korsak*).) However, Evidence Code section 1340 sets forth a hearsay exception: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule *if the compilation is generally used and relied upon as accurate in the course of a business* as defined in Section 1270." (Italics added.) Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) *Based on matter* (including his special knowledge, skill, experience, training and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates*, unless an expert is precluded by law from using such matter as a basis for his opinion." (Italics added.) We conclude that on this record the trial court properly admitted the challenged MRI data into evidence. (*People v. Rowland* (1992) 4 Cal.4th 238, 266 [14 Cal.Rptr.2d 377,

841 P.2d 897]; *Shamblin v. Brattain, supra,* 44 Cal.3d at pp. 478–479; *People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1073 [116 Cal.Rptr.2d 240] (*Clauser/Wells*); *Korsak,* at pp. 1524–1526.)

(a)

*Factual Background Bearing on Admissibility of Evidence of MRI's Data*

At trial, the parties presented conflicting expert evidence on the admissibility of the challenged MRI data. With respect to the trial court's foundational ruling to admit MRI's data into evidence, we consider the evidence and reasonable inferences most favorably to the People.

MRI collects and analyzes data from surveys about magazine readership. MRI's surveys are based on the question to survey respondents whether they have read or looked into an identified magazine within a specified recent time frame, generally seven days for weekly and 30 days for monthly magazines. Readership includes anyone who responded to the survey as having read or looked into the magazine. Because MRI's surveys measure only the opportunities to see the advertisements, its data provide estimates of the number of persons to whom the advertising in the magazine is potentially exposed.[12] Thus, the basic underlying unit of data obtained by MRI surveys is the number of people who read or looked into an issue of a magazine and therefore had the opportunity to, but did not necessarily, see an advertisement placed in the magazine.

MRI's surveys seek to measure two universes. MRI conducts in-person interviews of adults age 18 and above (adult study) in which questions are asked about more than 216 magazines. MRI also conducts a mail survey of persons age 12 to 19 (teen study) in which questions are asked about approximately 60 magazines. The teen study is intended to create an integrated data base. MRI combines the data from its adult study and teen study into a single study known as Twelveplus (everyone age 12 and above), used to measure both the adult and teen audience of a magazine. MRI's Twelveplus study includes every magazine measured in its teen study and gives totals for survey respondents age 12 through 17 plus the number of issues (zero to four) read or looked into for each magazine. Based on the Twelveplus data, a media advertising schedule's exposure to youth can be determined.

---

[12] In magazine advertising, "audience" means "the number of persons who are exposed to or potentially exposed to a magazine or to a schedule of magazine insertions."

MRI's data are considered the acknowledged industry standard for measuring and comparing readership of adults and teens in the same way that Nielsen is the standard for television ratings data and Arbitron the standard for radio listening data. Media planners use MRI's data as their "core essential tool" to measure magazine audiences and to plan and implement media advertising schedules. Most advertising agencies use MRI's data for their magazine audience measurements. Further, because MRI produces the dominant study in the teen measurement field, most advertisers interested in measuring teen audiences for magazines use MRI data as the basis for determining their ability to measure exposure of a magazine to teens.

The average magazine issue audience, referred to in the industry as "vehicle exposure," is the basis of the measurements provided by MRI (and Simmons) and the standard to evaluate the magazine's exposure to a target audience. As the predominant form of data available to the media planning and advertising industries, vehicle exposure is the primary criterion for evaluating magazine audiences. Vehicle exposure suggests how many people in general or in a target group have the opportunity to see a magazine advertisement. Also derived from MRI's vehicle exposure audience data are other measures, including composition, coverage, indices, gross impressions and target impressions. Those derivative numbers, as well as MRI's basic data, are used by media planners to measure and determine whether a media advertising schedule succeeds in reaching a target group.

Reynolds and its media planner use MRI's data to evaluate composition, coverage and indices. Magazine audience is generally measured by composition and coverage. Composition is the percent of a target group or other demographic group within the total audience of a magazine. Coverage is the percentage of a target group potentially exposed to an advertisement in a magazine. MRI's format identifies the composition of youth magazine audience and coverage of the magazine's exposure to youth. Index refers to the skew of a magazine to a demographic group. An index may compare the youth composition of a magazine's audience to the percent of youths in the total United States population.

Impressions are the number of advertising viewing opportunities generated by a media advertising schedule. Gross impressions (also called gross rating points) generally refer to the total audience. Gross impressions are cumulative numbers that are the sum of all the audiences of the various magazines across an entire media advertising schedule and suggest the total number of potential exposures to a media advertising schedule. The total audience of a single issue of a magazine multiplied by the number of insertions of advertising in

the magazine equals the gross impressions of the magazine. With respect to a target group, the measurements are expressed as target impressions or target rating points. Target rating points express gross impressions as a percentage of the target group with one rating point measuring impressions and equaling one percent of the target group. The total number of impressions divided by the particular population universe equals gross rating points or target rating points.[13] Media planners use target rating points from MRI's readership data to compare one media schedule to another or exposure to one demographic group to exposure to another.

Advertisers and media planners use the terms "reach" and "frequency" to measure the exposure of advertising to a defined group and to compare exposure of advertising among various groups. Reach means the percentage of a group potentially exposed to an advertising schedule during a specified time period. Frequency means the average number of times persons in the group are exposed to an advertising schedule during the specified time period. Target rating points are the product of the reach and frequency numbers.

Reach and frequency numbers can be derived from the MRI data. Reach is the percentage of a targeted audience to whom a magazine is exposed and quantifies the target audience covered. It also identifies to whom an advertisement is potentially exposed based on survey respondents who have read or looked into a magazine containing the advertisement within a designated time period. Because reach is the nonduplicated coverage of a target group, reach models are used to estimate the unduplicated audience of a media advertising schedule. Frequency is the average number of times that a media advertising schedule is exposed to a target group within a designated time period.

In short, reach refers to the percentage of the population to whom the magazine is exposed and frequency means on average how many times the magazine is exposed to them. Further, target rating points are equal to reach multiplied by frequency. MRI's reach and frequency numbers are estimated cumulative measures over a year. A reach of 95 percent means that 95 percent of the target group possibly saw the advertisement during the year. With respect to four-month data, monthly reach and frequency numbers can be based directly on MRI's tabulated data without any projections because they are real empirical data. However, annual reach and frequency numbers require use of extension formulas, including the beta binomial formula, to

---

[13] For example, if a demographic subgroup has 20 million people and 20 million impressions are delivered, that is equivalent to 100 gross rating points and to reaching everybody in that universe once each. That result could also be achieved by reaching half the people in the group twice or 40 percent 2.5 times each.

extend the reach over a one-year time frame. MRI uses the beta binomial formula only to distribute the gross impressions between reach and frequency. MRI's methodology for projecting cumulative reach is to take the survey data for one to four issues of magazines and then apply the beta binomial formula to arrive at the projection at the end of 52 weeks. MRI developed software for the purpose of obtaining estimates that would raise fewer concerns involving the overlap of which survey respondents read a magazine issue.

MRI's reach and frequency numbers are based on two different data bases: adult smoker measurements using MRI's adult study and youth measurements derived from MRI's composite Twelveplus data. MRI has sought to ensure that the data produced are as compatible as if they came from a single study. Although MRI's surveys for adults and youths differ from one another, processes exist to equate the two. In measuring magazine readership, MRI's teen study also weights and conforms the survey responses. The purpose of weighting is to ensure that those who respond to the survey are representative of the entire population. MRI's weighting process addresses the issue whether the 77 percent of teens who do not respond to the teen survey are like the 23 percent who do, and compensates for the differences in response rates of different demographic groups. Further, MRI uses a conforming procedure to lower the readership levels in its teen study because MRI's teen data have more overstatement compared to MRI's adult data. Thus, a reason for MRI's conforming adjustment is to reduce teen audience levels to the level of the teens who would have responded had they been administered MRI's adult survey.

Integrated Market Systems (IMS) provides software for various media analyses and has modified MRI's formula in a proprietary way. IMS has a program that compiles MRI data, inputs criteria (the target base) and produces reports based on the criteria. IMS's Modal model inputs a media advertising schedule and estimates how many people saw the magazines in that schedule. To calculate each media advertising schedule's exposure to its stated target, Reynolds used MRI's data on magazine readership as a source of information. Reynolds then used a computer software program (IMS Modal) to calculate a selected magazine's reach (the percentage of the target audience to whom the magazine is exposed) and frequency (the average number of exposures of the magazine).

MRI's data show considerable consistency over time as to which magazines are high or low for exposure to youth. Further, those data are also reliable with respect to the estimates of youth audience (the percent of the audience who are teens). MRI's data can be used to show who is being

exposed to magazines containing Reynolds's advertisements. Although from 1999 through 2001 young adult smokers age 21 to 34 generally constituted the stated target of Reynolds's advertising, during those years magazines containing Reynolds's advertising were exposed to youth in about the same percentages and about as often as exposed to young adult smokers. Those virtually identical numbers of advertising exposure to adult smokers and youth were unusual. Further, reaches of 80 percent or above suggested the result was not accidental.

In 1999 the reach of magazines containing Reynolds's advertising was 97.1 percent of youth with a frequency of 68.2 times and 97.9 percent of young adult smokers with a frequency of 62.7 times. In 1999 the reach of magazines containing Reynolds's Camel brand's advertising was 88.5 percent of youth with a frequency of 22.7 times and 88 percent of young adult smokers with a frequency of 16.8 times.

In 2000 the reach of magazines containing Reynolds's advertising was 95.2 percent of youth with a frequency of 54.7 times and 96.3 percent of young adult smokers with a frequency of 54.2 times. In 2000 89 percent of Reynolds's Camel advertisements were placed in magazines with youth audiences above the 10.4 percentage of youth in the United States population and 50 percent of the Camel ads appeared in magazines whose youth audience was above 18.5 percent. In 2001 although Reynolds reduced its overall level of magazine advertising, the target rating points were 1571 for adult smokers age 21 to 34 and 1392 for youth. In 2001 magazines containing Reynolds's advertising were exposed to 85.5 percent of youth an average of 16.3 times.

Reynolds also made an analysis of the distribution of gross impressions, an accepted method of measuring an advertising campaign's success in focusing on its target audience, by comparing its brands' advertising campaigns' exposure to the stated target with their exposure to other groups within the universe of adult smokers age 21 and over. The analysis uses an index with average delivery set at 100. Thus, an index of 200 means the group analyzed receives double the average number of exposures. The distribution index for Reynolds's Camel brand's advertising campaign in 2000 showed exposure to smokers age 21 to 24 was 183, reflecting that group received 83 percent more exposures than the average for all smokers age 21 and over. Those analyses of gross impression distributions showed high exposure to youth and smokers age 18 to 20. In many cases, exposure of advertising to those groups was higher than to Reynolds's stated target audience. If Reynolds had included those two younger age groups in the impressions distributions analyses it used in evaluating its own targeting, Camel's 2000 campaign's high exposure to very young adults would have been a "red flag" to Reynolds that its advertising was exposed to a high number of youth.

MRI's data can be used for the purpose of magazine selection if the goal is to select magazines with low youth audience and eliminate magazines with high youth audience. Reynolds could identify magazines that would best deliver its advertising to the target group and refine its delivery to ensure its advertising was not exposed to identified groups. By analyzing magazines in terms of composition, coverage and indices, Reynolds could select a different set of magazines to decrease exposure of its advertising to youth. The reach is a function of which magazines are selected. To reduce exposure to youth while maintaining significant exposure to adults, Reynolds could choose magazines with lower teen composition, lower teen coverage and lower teen audience.[14] Were Reynolds making an effort not to target youth, it would concentrate on magazines with a lower youth-to-young-adult ratio. To reduce exposure to youth, Reynolds could also reduce the number of magazines in which it advertised. Instead, in 2000 Reynolds's advertising was distributed fairly randomly in all magazines on its list instead of concentrated in magazines with low youth composition.

The People's media planning expert (Silverman) concluded that Reynolds's media advertising schedule suggested Reynolds was intentionally targeting, or consciously intending not to take positive action to avoid exposure of its advertising to, youth; and Reynolds's failure to do so suggested it knew with substantial certainty that its tobacco advertising was being exposed to youth.

(b)

*Analysis of Admissibility of Evidence of MRI's Data*

In admitting the People's proffered evidence of MRI's data over Reynolds's objections, the trial court found the testimony demonstrated those data were reliable, generally used and relied on as accurate. However, Reynolds asserts the court erred in admitting the evidence and contends MRI's weighted, conformed and adjusted survey results did not meet the requirements of Evidence Code section 1340's hearsay exception. Reynolds also contends MRI's teen data did not constitute a proper basis for expert opinion. (Evid. Code, § 801, subd. (b).) Reynolds contends no court could properly accept or reject the expert opinion testimony about the validity of the MRI data because there was assertedly no basis in the record to understand the procedures used to arrive at MRI's data. In effect, Reynolds seeks reweighing

---

[14] At trial, Reynolds's counsel acknowledged that the most important factor in devising a media plan is the list of magazines in which it placed advertisements.

on appeal of the conflicting evidence presented to the trial court. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881; *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290 [130 Cal.Rptr.2d 436]; *Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].) On this record the trial court acted within its broad discretion in admitting into evidence MRI's survey data and expert testimony based on those data. (*Korsak, supra,* 2 Cal.App.4th at p. 1523.)

MRI's surveys are conducted to obtain sample estimates for the number of people exposed to an average issue of a magazine. MRI's data involve results and statistical projections in terms of sample to population and from one or two weeks to an entire year. However, all surveys are subject to random variability. Except for a complete census of the entire population to which each person responds, no survey is perfect regardless of its size and no survey's results can be deemed accurate with certainty. The data in a survey such as an audience measurement study cannot be guaranteed as 100 percent reliable (expecting the same results if repeated samples are generated using the same methodology) or 100 percent valid (reflecting exactly what is happening in the universe). Instead, degrees of reliability and validity are recognized. Statistical reliability evaluates the absence of random error, which means the results of subsequent tests are close to the outcome in the initial test. A sample estimate is considered reliable to the extent it does not exhibit substantial random variability. Statistical validity is a measure of whether the test is suitable for its intended purpose, which evaluates whether test results are consistent with reality. Media research consultant Gray testified that in the case of national magazines, MRI's data have been accepted by the industry as providing sufficient reliability and validity to serve as the standard and the criteria for media evaluation.

Further, the People's statistics expert (Javitz) conducted a standard statistical analysis of MRI's readership data, and found MRI's survey was reliable and valid for purposes of measuring estimated adult and youth audiences for media schedules. Javitz found MRI's youth data had very good reliability, with very small margins of error with respect to the projected reach and the calculated frequencies for adult smokers age 21 to 34 and teens. Javitz thus concluded that MRI's studies were very good in terms of their margins of error and MRI's readership data were the most likely estimate of the magazine's exposure. Javitz also characterized the amount of random variability in the estimates of average impressions per teen, reach and frequency as sufficiently small to make the data useful. Moreover, Javitz found that the potential of bias in MRI's data caused by sample selection, weighting,

nonresponse bias, differences in the form of the questionnaire or problems with conforming was "minimal" if existent at all, and concluded those data were valid as truthfully expressing the real world. This evidence is contrary to Reynolds's contention that "no one in the industry really believes" MRI's data are "accurate."

Evidence supported the conclusion that MRI's weighted, conformed and adjusted survey results met the requirements of Evidence Code section 1340's hearsay exception and constituted a proper basis for expert opinion for purposes of Evidence Code section 801, subdivision (b). Gray testified that conforming in general is a common occurrence accepted within the media research industry and MRI's conforming procedure is accepted in that field. Similarly, Javitz found MRI's conforming process was reasonable, consistent with appropriate statistical methods and procedures, and included the action a statistician would take to adjust for differences in survey methods and procedures. Further, Javitz analyzed MRI's weighting process, and found zero potential bias. Moreover, Javitz found that MRI's surveys were conducted in accordance with appropriate and generally accepted methods and procedures followed by social scientists and statisticians, specifically with respect to MRI's sampling procedure and, in particular, MRI's selection of its teen sample. Additionally, the People's survey design expert (Kamins) testified: MRI's teen survey's sample size of more than 3,000 was sufficiently large to support "pretty steady inferences"; MRI's teen study's universe definition and sample size were trustworthy; the design and administration of the survey instrument in MRI's teen study were trustworthy; MRI's teen study's response rate was more than adequate; MRI's teen study was trustworthy; hence, validity and reliability were present; if validity is present, reliability is present by definition; if the observed measure equals truth, random variation is eliminated; and if random variation is eliminated, reliability is present by definition. Finally, with respect to Reynolds's attack on the procedures used to arrive at MRI's data, the record contained the testimony of MRI's vice president of software development (Safran) that IMS's Modal model is generally used for planning purposes and accepted as a reasonable representation of reach and frequency; and compared to other actual tabulated data, the model produces numbers that are reasonable given that it is a model and is adequate for use for industry practices.

Reynolds also attacks the court's findings that magazines in which Reynolds advertised were exposed to 97.1 percent of youth and 97.9 percent of adults in 1999; magazines in which Reynolds advertised were exposed to 95.2 percent of youth and 96.3 percent of adults in 2000; and those levels of exposure to youth and adults were essentially the same. Reynolds contends that on their face, such high percentages do not pass the common sense test. However, Javitz testified it was plausible that for a year rather than a

six-month period, Reynolds's advertising could have obtained an exposure in the mid-90's for its 2000 media plan.

Evidence also suggested the utility of MRI's data is not limited to its precise numbers. Instead, MRI's data can be used to show who is exposed to magazines containing Reynolds's advertisements because those data portray the comparison of exposure to various groups. The People's media planning expert (Silverman) testified it was appropriate to compare annual reach and frequency numbers of Reynolds's media plans for youth with the stated adult target because those numbers are an indicator of those to whom the advertisement is really being exposed and how often exposed over the course of a year. Further, target rating points are also valuable for media planners as a comparative measure of one schedule to another or one year to another. Thus, although characterizing as "very fuzzy" the line between using MRI's data for relative comparison and accepting the data at face value, Gray testified that looking at teen-measured magazines' exposure to adult smokers and youth was a way of indicating whether there was targeting to any particular group and the degree to which that occurred.[15] Moreover, noting that impressions and target rating points are derived directly from MRI's data and are the input to the computer models while the output is the reach and frequency for the time period a model is asked to calculate, Gray concluded that to put things on a relative per capita basis, it is more meaningful to look at target rating points for purposes of comparing delivery of youth-measured magazines. Similarly, Reynolds's statistics expert (Olkin) acknowledged that MRI's data were not implausible and that any unreliability resulting from application of computerized extension formulas had nothing to do with gross impressions. Further, the relationship between high exposure to adults and youth is the same whether viewed on an annual, quarterly or monthly basis. Thus, for comparison purposes, annual numbers are appropriate. Additionally, the numbers can be used to compare one media advertising schedule to another or one vehicle to another. As observed by Reynolds's senior vice president of marketing (Creighton), relative comparisons over time show whether a media plan is successful.

██ Statements within the hearsay exception of Evidence Code section 1340 are sufficiently trustworthy to overcome concerns about the reliability of those hearsay statements. (*In re Michael G.* (1993) 19 Cal.App.4th 1674, 1677–1678 [24 Cal.Rptr.2d 260]; *Miller v. Modern Business Center* (1983) 147 Cal.App.3d 632, 635 [195 Cal.Rptr. 279] ["[t]rustworthiness is reasonably assured by the fact that the business community generally uses and relies upon the compilation and by the fact that its author knows the work will have no commercial value unless it is accurate"].) In admitting MRI's data into

---

[15] Gray noted that in practice, media planners and buyers are concerned not with probabilities or the standard error but instead with the numbers at face value.

evidence, the trial court found MRI is the most widely used and accepted service for measuring magazine exposure in the United States; MRI's adult and teen surveys are conducted in accordance with appropriate and generally accepted methods and procedures followed by social scientists and statisticians; MRI's adult and youth data are valid and reliable; and MRI's adult and youth data are generally used and relied on as accurate in the course of business. "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*Shamblin v. Brattain, supra,* 44 Cal.3d at pp. 478–479; *Korsak, supra,* 2 Cal.App.4th at p. 1523.) ▪ On this record, substantial evidence and reasonable inferences supported the trial court's foundational ruling to admit MRI's data into evidence. Further, even if MRI's youth data were inadmissible hearsay, the court could have correctly concluded the data constituted a proper basis for expert opinion because advertising experts reasonably rely on those data to determine exposure of magazine advertising to youth. (Evid. Code, § 801, subd. (b); *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *Korsak,* at pp. 1524–1525 [experts have "considerable leeway as to the material on which they may rely"].) The court did not abuse its discretion by admitting MRI's data into evidence or permitting the People's experts to give testimony based on those data.

Although Reynolds contends the evidence of MRI's data was inadmissible as unreliable and expert testimony based on those data was also inadmissible, Reynolds essentially concedes that if those matters were properly admitted, there is substantial evidence to support the ultimate judgment favoring the People. Considering our interpretation of MSA, subsection III(a)'s prohibition on youth targeting and our determination upholding the trial court's foundational evidentiary rulings, on this record we conclude substantial evidence and reasonable inferences established that Reynolds violated MSA, subsection III(a) by targeting its tobacco advertising to youth. (*Cel-Tech, supra,* 20 Cal.4th at p. 172; *Kramme, supra,* 20 Cal.3d at pp. 572–573; *Schroeder, supra,* 11 Cal.3d at p. 922 & fn. 10.)

4

*Evidence of Violation Within California*

To establish violation of the prohibition against targeting youth set forth in MSA, subsection III(a) and Consent Decree, section V(A), the People were required to prove Reynolds targeted youth within the State of California. In its statement of decision, the trial court found, based on MRI's data, that in 1999, "97.1 percent of Youth across the country, including California, were exposed to [Reynolds's] ads 68.2 times."

In its statement of decision, the trial court also concluded that nothing in the evidentiary record could reasonably support a determination that MRI's nationwide data did not apply to California. In reaching that conclusion, the court noted that Reynolds did not object at trial to introduction of the nationwide MRI data on the ground the data did not correctly reflect exposure to youth in California. The court also noted Reynolds did not present substantial evidence that MRI's results for California would differ from nationwide results.

Reynolds attacks the court's conclusion as improperly ignoring that it was the People's burden to prove Reynolds violated the youth targeting prohibition in California. Further, characterizing the People's case as built on nationwide MRI data measuring magazine readership, Reynolds contends the People did not attempt to limit the data to California or derive any statewide exposure measurements from MRI's nationwide data. Reynolds asserts that MRI's data did not show Reynolds engaged in any action in California that violated the prohibition on youth targeting set forth in the MSA or Consent Decree, and contends the court could not correctly assume the magazine exposure measured nationwide by MRI was proportionately the same within California. However, on this record Reynolds cannot establish it was prejudiced by any error in the court's reasoning or analysis on this issue because it is not reasonably likely an outcome more favorable to Reynolds would have resulted absent the error. (§ 475; Evid. Code, § 353, subd. (b); *People v. Watson, supra,* 46 Cal.2d at p. 836.)

In response to Reynolds's counsel's question, "don't you think that more than 5 percent of teens in California don't read magazines that contain Reynolds's cigarette ads?" the People's survey design expert (Kamins) testified that the MRI data have a range of error and their statistical variation might increase the number to 7 percent. Further, MRI's sample was disproportionately over-allocated within MRI's 10 major media markets, which were "self-representing" and included Los Angeles and San Francisco. The final 1999 media recommendation for Reynolds's Camel brand sought to maintain its market share of sales to the target audience in key Camel brand markets; and that recommendation contained advertising schedules for alternative weeklies in the "core market" of Los Angeles and the "non-core markets" of Oakland, San Diego, San Francisco, San Jose and Sacramento. The final 1999 recommended media plan for Reynolds's Winston brand contained media advertising schedules for alternative publications in Los Angeles, San Diego, San Francisco and San Jose/Santa Cruz. With respect to market selection rationale, the final 2000 media recommendation for Reynolds's Camel brand identified markets—including Los Angeles/Long Beach, Oakland, San Diego, San Francisco, San Jose and Sacramento—as possessing a high percentage of 18-plus population, high Camel market share, and

alternative weeklies; and that recommendation contained advertising schedules for alternative weeklies in Los Angeles, Oakland, Sacramento, San Diego, San Francisco, and San Jose. The final 2001 print plan for Reynolds's Winston brand contained a recommended publication list that included alternative weekly publications in Los Angeles, Sacramento, San Diego, and San Francisco. We conclude that, regardless of any error in its reasoning or analysis, the trial court's implied finding that Reynolds's advertising targeted youth within California was supported by substantial evidence and reasonable inferences drawn from that evidence.

5

*Evidence Involving Reynolds's Competitors*

Philip Morris and B&W are competitors of Reynolds. Over Reynolds's hearsay objection, the trial court permitted the People to introduce evidence of those competitors' policies regarding advertising to youth. The court's statement of decision contained various references to that evidence.

First, the trial court found as fact: (1) In January 2000, B&W announced a policy that it would not place tobacco advertising in any publication with a youth composition of more than 15 percent; (2) in May 2000, Philip Morris announced a policy that it would not place tobacco advertisements in any publication with a youth composition of more than 15 percent or that is exposed to more than two million youth; and (3) in 2000, "there was a decline in the amount of print advertising, money spent by Philip Morris and B&W and in the amount of Youth exposure to their print advertising . . . ."

The trial court stated that the "actual practice of other tobacco companies, such as Philip Morris, demonstrates that it is possible to reduce Youth exposure in print media advertising to levels below those for targeted adult smokers while maintaining significant exposure to adult smokers."

Finally, in its legal conclusions and findings bearing on the construction of the prohibitions in the MSA and Consent Decree on youth targeting, the trial court stated the evidence established Philip Morris and B&W reduced their advertising exposure to youth after signing the MSA by not advertising in publications having more than 15 percent youth composition, with Philip Morris also deciding not to advertise in publications with exposure to youth of more than two million. The court then characterized the conduct of Philip Morris and B&W as providing "strong circumstantial evidence that they believed that dramatic steps to reduce Youth exposure to tobacco advertising had to be taken to comply with the requirements of the MSA."

Attacking the trial court's findings and conclusions about Philip Morris and B&W as dependent on inadmissible hearsay evidence, Reynolds contends no witness from those companies testified at trial or deposition, no document created by or from the files of those companies was admitted into evidence, and no testimony or document describing the print placement policies of those companies was admitted for its truth. Reynolds also notes the court admitted two Reynolds-created documents describing the print policies of Philip Morris and B&W to show Reynolds's state of mind but expressly not to prove the truth of those companies' internal policies.[16] Reynolds contends the court abused its discretion by violating its own rulings and relying on those policies for their truth. (*People v. Rowland, supra,* 4 Cal.4th at p. 266; *Shamblin v. Brattain, supra,* 44 Cal.3d at pp. 478–479; *Clauser/Wells, supra,* 95 Cal.App.4th at p. 1073; *Korsak, supra,* 2 Cal.App.4th at pp. 1524–1526.)

Reynolds contends that in construing MSA, subsection III(a), the trial court improperly relied on the actions of Philip Morris and B&W in changing their policies. Reynolds asserts the court improperly concluded that Philip Morris and B&W believed the changes were required by MSA, subsection III(a). However, our interpretation of subsection III(a) differs from the trial court's interpretation and does not depend on conclusions about Reynolds's competitors' reasons for their policy changes. Therefore, Reynolds does not demonstrate reversible error by the trial court with respect to those competitors' beliefs about the meaning of MSA, subsection III(a).

Reynolds also contends that in concluding the actions of Reynolds's competitors demonstrated the possibility of reducing levels of print media advertising exposure to youth while maintaining significant exposure to the stated target of young adult smokers, the trial court improperly accepted the truth of the hearsay evidence of the substance and results of those competitors' new policies and practices regarding advertising exposure to youth. However, because there is sufficient other evidence showing other media

---

[16] A June 2000 Reynolds memorandum inviting attendance at a meeting at which the subject would be Reynolds's "recently-revised magazine approval policy" and at which there would also be discussion of "recent announcements by Philip Morris relative to print advertising and what those announcements mean in terms of publications affected" was admitted to show only Reynolds's state of mind. Accompanying the memorandum were Reynolds's descriptions of Philip Morris's policy announcements that Philip Morris advertisements would no longer appear on magazine back covers and would not appear in any publication with a composition greater than 15 percent of readers under age 18 or with more than two million readers under age 18; a list of magazines in which Philip Morris's cigarettes would no longer be advertised; and a list of magazines remaining within Philip Morris's guidelines.

Also admitted to show only Reynolds's state of mind was a January 2000 Reynolds message regarding "coverage of B&W's internal policy of not advertising in" publications with more than "15 % readership under the age of 18" and noting that Reynolds had received numbers about "readership breakdowns" of each of the publications.

advertising schedules could reduce advertising exposure to youth while maintaining significant exposure to Reynolds's stated target, Reynolds does not demonstrate that the outcome at trial would have been more favorable to Reynolds absent the competitor-related evidence that alternative media advertising schedules were available.

Reynolds's media director/senior manager for media planning (Ittermann) testified that in the period of June 2000 to March 2001 she was aware that Philip Morris had adopted a policy of not advertising in a magazine with more than 15 percent youth composition or with an exposure to more than two million youth. Ittermann had also looked at the application of that Philip Morris policy on the magazines in which Reynolds advertised. Further, as acknowledged by Reynolds, the trial court properly admitted Reynolds-created documents regarding its competitors' policies to the extent probative of Reynolds's state of mind. On this record, those documents were at most cumulative to other evidence that Reynolds targeted its tobacco advertising to youth.

B

*Sanction Award*

At trial, the parties agreed the Consent Decree entitled the People to seek monetary sanctions for violation of the Consent Decree. [17] The trial court's judgment ordered Reynolds to pay the People $20 million in monetary sanctions based on its finding that Reynolds violated section V(A) of the Consent Decree. Reynolds asserts the trial court abused its discretion and attacks the $20 million sanction award as unsupported by the evidentiary record and without findings supporting the amount imposed. (*Palm Valley Homeowners Assn., Inc. v. Design MTC* (2000) 85 Cal.App.4th 553, 558 [102 Cal.Rptr.2d 350]; *Winikow v. Superior Court* (2000) 82 Cal.App.4th 719, 726 [98 Cal.Rptr.2d 413]; *Childs v. PaineWebber Incorporated* (1994) 29 Cal.App.4th 982, 996 [35 Cal.Rptr.2d 93]; *Young v. Rosenthal* (1989) 212 Cal.App.3d 96, 124 [260 Cal.Rptr. 369].) Reynolds also contends the amount of sanctions awarded for its conduct in California violated due process

---

[17] Section VI(A) of the Consent Decree provides in relevant part: "For any claimed violation of this Consent Decree and Final Judgment, in determining whether to seek an order for monetary, civil contempt or criminal sanctions for any claimed violation, the Attorney General shall give good-faith consideration to whether: (1) the Participating Manufacturer that is claimed to have committed the violation has taken appropriate and reasonable steps to cause the claimed violation to be cured, unless that party has been guilty of a pattern of violations of like nature; and (2) a legitimate, good-faith dispute exists as to the meaning of the terms in question of this Consent Decree and Final Judgment. The Court in any case in its discretion may determine not to enter an order for monetary, civil contempt or criminal sanctions."

because it was based on Reynolds's spending on nationwide print advertising without evidence of Reynolds's spending on advertising in California. (Cf. *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513, 1521–1522] *(State Farm)*; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 571–572 [134 L.Ed.2d 809, 116 S.Ct. 1589] *(BMW)*; *White v. Ford Motor Co.* (9th Cir. 2002) 312 F.3d 998, 1015–1016, 1018, 1020 *(White)*.) The People assert both the imposition and amount of sanctions were reasonable, and contend the award was justified by Reynolds's "knowing, flagrant, and persistent violation of the preexisting injunction, its steadfast refusal to cure its violation voluntarily, and the magnitude of the harm it inflicted." However, although the trial court gave adequate reasons for imposing sanctions, the court improperly based the amount of the sanction award on (1) Reynolds's national advertising spending rather than on Reynolds's advertising spending in California and (2) Reynolds's wealth. We conclude the portion of the judgment awarding sanctions must be reversed.

1

*Entitlement to Sanctions*

The trial court stated the sanctions against Reynolds were "[b]ased on the evidence presented in this case" and recited in its statement of decision the evidence that entitled the People to sanctions. We summarize the evidence detailed by the court and the court's findings based on that evidence.

(a)

*Evidence on Sanctions*

After signing the MSA in 1998 and until June 2000, Reynolds made no changes in its print media policies, did not include the goal of reducing tobacco advertising exposure to youth in its marketing plans, avoided conducting media research to determine the extent to which its print advertising was exposed to youth, and otherwise took no action to evaluate whether it was meeting its professed goal of reducing youth smoking. Instead, Reynolds followed its previous pattern of avoiding advertising in magazines with more than a 50 percent composition of youth.[18]

---

[18] The court noted that in December 1999 after state attorneys general had expressed concern to Reynolds about youth targeting in magazine advertisement placement, Reynolds's general counsel wrote to the National Association of Attorneys General Tobacco Committee: "We are unwilling to preclude ourselves from advertising in publications which have more than a certain number of 'readers' who are under the age of 18 when that number is less than 50 percent of 'readers.' This would preclude us from one or more of the most popular

Although Reynolds subsequently made changes in its media advertising schedule, those changes had minimal impact in reducing exposure of its advertising to youth. After Reynolds in June 2000 announced a 33 1/3 percent youth composition policy, the only tangible consequence of that change was the removal of one magazine (Vibe) from Reynolds's media advertising schedule. In March 2001 on the date the People filed this lawsuit against Reynolds, Reynolds announced a policy of not advertising in any magazine having a youth composition over 25 percent according to MRI's or Simmons's data. As a result of that change in policy, Reynolds eliminated one publication in which it was advertising (Spin) and removed from its media advertising schedule three publications in which it was not advertising.

Meanwhile, in 1999 through 2001 in devising media plans for its nation-wide magazine advertising, Reynolds used MRI's data to measure the quanti-tative effectiveness and demographic composition of the audience to which its print media campaign was exposed, including reach, frequency and target rating points. Reynolds also used MRI's data to measure the effectiveness of its print advertising in targeting various segments of the adult market.

The stated target of most of Reynolds's print media advertising was young adult smokers age 21 to 34. Reynolds's Camel brand also targeted adults age 21 to 24. MRI's 1997–2001 data indicated exposure of Reynolds's print media advertising to its stated target of young adult smokers and to youth age 12 to 17 was essentially the same. Further, according to MRI's data based on 38 teen-measured magazines, Camel advertising exposure to youth increased after the MSA was signed. Moreover, Reynolds advertised in many maga-zines exposed to large youth composition, including Sports Illustrated with exposure to about 5 million youth. In addition to advertising in magazines exposed to a higher percentage of youth than young adult smokers, Reynolds also advertised in many magazines exposed to youth at disproportionately higher levels than adult smokers.[19]

After signing the MSA, Reynolds exposed its tobacco advertising to youth at levels similar to those of targeted groups of adult smokers. Although Reynolds had access to MRI's and Simmons's data that would have revealed the reach and frequency of Reynolds's advertising to youth to be about the same as for the stated target groups of adult smokers, Reynolds did not

publications, even if this 'readership' overwhelmingly was adult—a result which would damage us competitively and unacceptably oust us from one of the remaining media through which we can communicate with adults who smoke."

[19] The court noted that 89 percent of Camel advertisements in year 2000 were in magazines with youth composition exceeding the percentage of youth (10.4 percent) in the United States population.

examine those data. Further, it was possible to develop and implement media advertising schedules and measure their success with the purpose of reducing exposure of cigarette advertising to youth while retaining significant exposure to adult smokers. Minimizing exposure to certain groups was also possible because the character of magazine advertising allowed advertisers to identify demographic groups based on age, income and lifestyle. Reynolds could have developed media advertising schedules to achieve effective exposure through print advertising to adult smokers while also significantly reducing exposure to youth.[20] However, despite its stated post-MSA policy of avoiding targeting youth in its advertising, Reynolds did not attempt to measure the success of that goal although it could have done so through use of available data it used to measure its other media-related goals.

(b)

*Trial Court's Findings on Entitlement to Sanctions*

Federal case law involving punitive damages is instructive with respect to the People's entitlement to sanctions. In *State Farm, supra,* 123 S.Ct. at page 1521, the Supreme Court stated the " 'most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' " Further, the Supreme Court has "instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical [in contrast] to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.] The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." (*Ibid.*) We summarize the trial court's findings bearing on the People's entitlement to sanctions.

In 1999 and 2000, Reynolds did nothing to reduce its tobacco product advertising exposure to youth. In 2001 Reynolds did "very little." Further, Reynolds took action only after being given notice of the People's intent to file this lawsuit, and waited until the day this action was filed to take insufficient remedial action. Moreover, despite access to data by which exposure to youth could have been compared to exposure to adult smokers,

---

[20] The court noted the People's media planning expert (McCullough) developed media advertising schedules that achieved effective exposure through print advertising to 87 to 92 percent of adult smokers while demonstrating significant reduction to youth exposure.

Reynolds "intentionally avoided" examining those data that would have confirmed whether Reynolds was succeeding in its stated intention to avoid exposure of its tobacco advertising to youth. Reynolds's failure to measure whether it was meeting its stated goal of minimizing exposure to youth "casts doubt" on Reynolds's intent to abide by either the MSA's terms or Reynolds's expressed intention to avoid targeting youth. In "a corporate world where most goals are set and then measured, it strains credibility that [Reynolds] seriously set avoidance of Youth exposure as a goal, and yet, unlike any other goals it set for its performance, refused to measure the attainment of this goal." Examination of available data would have shown that Reynolds's advertising exposed 97.1 percent of youth 68.2 times on average in 1999; 95.2 percent of youth 54.7 times on average in 2000; and 85.5 percent of youth 16.3 times on average in 2001. Those figures were substantially similar to the figures for targeted adult smokers during those periods.

Further, at various times between 1999 and 2001, Reynolds's policy allowed it to advertise in magazines with youth composition of up to 50, 33 1/3 or 25 percent. Although Reynolds's president (Beasley) "professed" not to know that only about 10 percent of the United States population was made up of teenagers, the evidence made it "reasonable to infer" that Reynolds's "knowledgeable and talented marketing people . . . knew this fact." Moreover, during those years, Reynolds's policy also allowed it to advertise in magazines in which youth represented two and one-half to five times the proportion of youth in the population. Additionally, between 1998 and 2001, Reynolds devoted a substantial portion of its advertising to magazines with a disproportionately high youth composition, including rock entertainment music magazines (Spin, Vibe and Rolling Stone) and motor magazines (Hot Rod and Car and Driver). Under those circumstances, it was "reasonable to conclude" that Reynolds, even without examining all the data at its disposal, knew with substantial certainty that it was exposing its print advertising to youth at levels at least as great as its exposure to adults.

Additionally, Reynolds was losing market share and believed it had to be more aggressive than other tobacco companies in its advertising to prevent loss of additional market share "even though the likely effect of these efforts" would cause significant exposure of its tobacco advertising to youth. Thus, to achieve its marketing goals in the most direct manner, Reynolds "willingly engaged in an aggressive print advertising campaign to maximize exposure to targeted groups such as Young adult smokers" while "simply choosing to ignore" the substantial certainty of significant exposure to youth. Although in 2001 a Reynolds executive announced that Reynolds understood the MSA sought to effect a dramatic reduction of tobacco advertising exposure to youth

while allowing limited communications with adult smokers, Reynolds nevertheless "conducted itself in a manner inconsistent with its understanding of the [MSA's] mandate" by pursuing an extensive advertising campaign aimed at young adult smokers without taking any action to effect a reduction of exposure to youth.

Moreover, testimony by media experts suggested that if a specific age group like young adults was targeted, other age groups closest to the targeted age group would also be reached in higher proportion than groups more distant in age from the targeted group. Further, a substantial portion of Reynolds's advertisements appeared in publications in which youth composition was disproportionately higher than young adult composition. The "totality of this evidence leads to the logical conclusion that it was or should have been apparent" to the people managing Reynolds's "multimillion dollar sophisticated print advertising campaign" that its tobacco advertising was exposed to youth at levels substantially similar to targeted adult smokers.

"Taking all of the evidence presented into account, it appears likely [Reynolds] studiously avoided analyzing" the reach and frequency of its advertising to youth age 12 to 17 or comparing those figures to the reach and frequency of its target group of young adult smokers because Reynolds "knew the likely result of such analysis." That evidence also provides strong circumstantial support for the conclusion of the MRI data that Reynolds succeeded in exposing its advertising to youth at essentially the same levels as the exposure to its targeted young adult smokers and thus violated the MSA's prohibition on targeting youth.

 In sum, in its statement of decision the trial court made detailed references to the evidence and numerous findings adequate to support its determination that sanctions were warranted for Reynolds's conduct in not taking appropriate and reasonable steps to cure the claimed violation of MSA, subsection III(a) and Consent Decree, section VI(A). (*State Farm, supra*, 123 S.Ct. at p. 1521.)[21]

---

[21] Reynolds's contention that sanctions were unwarranted because the parties assertedly had a "legitimate, good-faith disagreement about the proper interpretation" of MSA, subsection III(a) is not on this record persuasive. (Consent Decree, § VI(A).) Reynolds asserts the basis for the sanction award was the trial court's "aggressive interpretation" of subsection III(a), an interpretation characterized by Reynolds as "at best ambiguous." However, consistent with Reynolds's proffered construction of subsection III(a)'s prohibition on youth targeting, we have interpreted the subsection as requiring proof of intent to demonstrate a violation of that prohibition. Based on our review of this record in accordance with our interpretation of subsection III(a), Reynolds violated that subsection by targeting youth because it knew with

2

*Amount of Sanction Award*

Although on this record the trial court could properly conclude the People were entitled to an award of sanctions, the court did not provide an adequate rationale for the amount of sanctions imposed.

■ The People based their request for $20 million in sanctions on Reynolds's nationwide advertising spending, not on its California advertising spending. Specifically, in arguing to the court, the People asserted: "The People believe that monetary sanctions of $20 million is reasonable in this case. That represents about 10 percent of the money that Reynolds spent on magazine advertising during the relevant three-year period, and is less than one percent of Reynolds's cash on hand at the end of 2001. This is reasonable." However, the holdings in various federal cases involving punitive damages lead to a conclusion that the award of sanctions for Reynolds's conduct in California could not properly be based on Reynolds's nationwide financial figures without violating Reynolds's due process rights. (*State Farm*, *supra*, 123 S.Ct. at pp. 1521–1522; *BMW*, *supra*, 517 U.S. at pp. 571–572; *White*, *supra*, 312 F.3d at pp. 1015–1016, 1018, 1020.)

Punitive damages are "aimed at deterrence and retribution." (*State Farm*, *supra*, 123 S.Ct. at p. 1519.) "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. [Citations.] The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." (*Id.* at pp. 1519–1520.) "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." (*Id.* at p. 1520.)

"Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." (*State Farm*, *supra*, 123 S.Ct. at p. 1522.) However, a "State cannot punish a defendant for conduct that may have been lawful where it

substantial certainty its tobacco advertising was exposed to youth to the same extent it was exposed to young adults. The sanctions are based on that violation.

Reynolds's contention that the sanction award improperly punished Reynolds's First Amendment communication with adult smokers is also unpersuasive. Reynolds was sanctioned not for its constitutionally protected communication with adult smokers but instead for its violation of MSA, subsection III(a) by targeting youth in its tobacco advertising.

occurred." (*Ibid.*)[22] Moreover, as a general rule, a State does not have "a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." (*Ibid.*) Similarly, in *White, supra*, 312 F.3d at page 1018, the court stated that " 'a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' . . . conduct in other States, whether the extraterritorial conduct is lawful or not." (Fn. omitted.) Thus, a "punitive damages award that encompasses a defendant's extraterritorial conduct may be unconstitutional even if the size of the award itself . . . is not outside the bounds of due process." (*Id.* at p. 1016, fn. omitted.)[23] In our view, the principles applicable to punitive damage awards are applicable to the sanctions imposed in this case.

■ Here, the People's request for $20 million in sanctions was based on Reynolds's nationwide spending on print advertising and profitability without evidence of its advertising spending or profitability in California. Similarly, the trial court's statement of decision focused on Reynolds's nationwide financial numbers. (*White, supra*, 312 F.3d at p. 1015.) Specifically, the court found: (1) Between 1999 and 2001, Reynolds spent more than $200 million on print advertising; (2) in 1999 Reynolds earned $195 million; in 2000, $352 or $353 million; and in 2001, $444 million; and (3) at the end of 2001, Reynolds's holding company held cash and short-term investments of more than $2.2 billion. However, the People have not demonstrated that they have any interest in punishing Reynolds for its conduct outside California's jurisdiction. (*State Farm, supra*, 123 S.Ct. at p. 1522; *White*, at pp. 1015–1016, 1018, 1020.) On this record we cannot say that in awarding sanctions based upon Reynolds's nationwide numbers, the trial court was vindicating only California's "interest in protecting its citizens." (*White*, at p. 1015.) Further, Reynolds's "extraordinary wealth" does not support the amount of the sanction award. A defendant's wealth "cannot justify an otherwise unconstitutional punitive damages award." (*State Farm*, at p. 1525.) Accordingly, on this record the award of sanctions in the amount of $20 million must be reversed.

---

[22] In *State Farm, supra*, 123 S.Ct. at page 1521, the Supreme Court noted: "While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further. . . . [¶] This case, instead, was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country. The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct direct[ed] toward the Campbells."

[23] In *White, supra*, 312 F.3d 998, the "evidence focused on the number of vehicles Ford sold nationally, and the number of parking brake failures reported nationally." (*Id.* at p. 1015.) "In essence, the jury was asked to measure damages by Ford's harm to the whole country." (*Ibid.*) Thus, the court reversed a punitive damages award on the ground the "award unconstitutionally allowed a Nevada jury to punish Ford for out-of-state conduct . . . ." (*Id.* at p. 1020.)

## III

## DISPOSITION

The portion of the judgment awarding the People sanctions against Reynolds is affirmed as to entitlement but reversed as to amount and remanded for further proceedings. In all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

McConnell, P. J., and Haller, J., concurred.

A petition for a rehearing was denied March 19, 2004, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 9, 2004.