Filed 8/23/24  7th Avenue and A Street v. Onni Capital CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| 7TH AVENUE AND A STREET, INC., | D082371 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2020-00019044-CU-BC-CTL) |
| ONNI CAPITAL, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Ervin Cohen & Jessup, Michael D. Murphy and Pooja S. Nair, for Defendant and Appellants.

Fitzgerald Knaier, Kenneth M. Fitzgerald and Kyle W. Hoffman, for Plaintiff and Respondent.

Defendant and appellant Onni Capital, LLC (Onni) appeals from a judgment in favor of plaintiff and respondent 7th Avenue and A Street, Inc. (7th Avenue) on 7th Avenue's breach of contract claim.  7th Avenue alleged Onni repudiated its obligations under the contract, a purchase and sale agreement (the purchase agreement or agreement) for a parcel of real

property (the property), by claiming the COVID-19 pandemic excused its performance due to a material adverse change to the property's condition as well as commercial frustration and impracticability. Following a bench trial, the court found Onni had breached the purchase agreement and awarded 7th Avenue $2 million in liquidated damages plus prejudgment interest, as well as costs and attorney fees.

Onni contends: (1) the trial court erred in various ways by interpreting and applying the purchase agreement's "material adverse change" clause, which operated as a condition precedent encompassing any aspect of the property's condition including its financial or economic condition and entitlements; (2) assuming the court correctly interpreted the agreement, 7th Avenue did not satisfy its burden to prove the condition precedent to Onni's contractual obligations (the absence of a material adverse change in the property's condition), requiring that judgment be entered in its favor; and (3) the court deprived it of its constitutional right to a jury trial on the issue of the purchase agreement's interpretation. Onni asks us to strike the attorney fee and costs award in 7th Avenue's favor if we reverse the judgment. We reject Onni's contentions and affirm the judgment, leaving the attorney fee and costs award intact.

FACTUAL AND PROCEDURAL BACKGROUND

We take most of the background facts from the unchallenged factual findings in the trial court's statement of decision and the trial exhibits, including the purchase agreement. (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1023.) We set out other facts in the light most favorable to the judgment in 7th Avenue's favor.

Onni is a sophisticated real estate investment company. 7th Avenue, managed by a commercial real estate developer, owns the property, which is

2

located at 7th and A Streets in San Diego.  7th Avenue purchased the property with a development permit and an existing set of entitlements.  In June 2019, Onni and 7th Avenue entered into an agreement for the property's sale.  Both parties were represented by counsel.  Onni initially agreed to pay $18.25 million for the property, but through negotiations the price was reduced to $17 million.  Onni's purpose for purchasing the undeveloped but permitted property was to build a high-rise residential apartment building and profit from rents collected from tenants.

The agreement's "purchase and sale" provision states:  "Upon the terms and conditions hereinafter set forth [7th Avenue] agrees to sell and [Onni] agrees to purchase the Real Property together with [7th Avenue's] interest in any assignable rights and appurtenances pertaining thereto, including, but not limited to, entitlements, development rights and land use approvals (the Real Property and such appurtenances being sometimes hereinafter collectively referred to as the 'Property')."  The purchase agreement gives Onni a right to terminate "for any reason or no reason" after a due diligence period during which Onni was to determine "whether the [p]roperty is physically, legally, economically, and operationally satisfactory."  The purchase agreement also contains a section making Onni's obligations subject to the satisfaction of certain conditions precedent.  The relevant provisions read:

"10.1.4  No Material Adverse Change.  On or before the Closing, there shall have been no material adverse change in the condition of the Property.

"10.2  Election to Terminate.  If, by the applicable dates and times specified in Section 10.1 above, any of the conditions set forth in Section 10.1 above are not satisfied for any reason whatsoever . . . [Onni] may terminate this Agreement by written notice to the Seller . . . ."

3

Onni agreed that following the due diligence period and after it delivered a notice to proceed with the sale, it would purchase the property "as is," based solely on its investigation and inspection, and that it "shall accept the property, without any representation or warranty whatsoever, express, implied or otherwise (other than those set forth in this agreement), including without limitation as to the: . . . value, nature, quality or physical condition of the property"; "income derived from the property"; "profitability or fitness of the property for a particular purpose"; and "ability to develop the property or any restrictions on development . . . ."  (Capitalization omitted.)

The purchase agreement contains a liquidated damages clause under which Onni would deposit funds into an escrow account as "earnest money" that would constitute a down payment toward the sales price.  If Onni failed to pay the entire sales price by the agreed date for the close of escrow, then Onni would forfeit the deposit to 7th Avenue as breach of contract damages. The agreement is integrated.[1]

During the due diligence period, Onni notified 7th Avenue that issues had arisen with increased affordable housing fees and a sewer easement running through the property that caused "substantially higher structural design and construction costs . . . ."  Onni related it was prepared to move forward, but that the matters warranted an amendment reducing the

_____

[1]	The integration clause provides:  "16.9 Entire Agreement.  This agreement supersedes all prior discussions and agreements between [7th Avenue] and [Onni] with respect to the property and contains the entire agreement of the parties hereto. No representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect, and all offers, letters of intent, representations, and commitments heretofore made between the parties are merged into this agreement."  (Some capitalization omitted.)

4

property's purchase price and extending the closing date.[2] The parties eventually entered into a third amendment with a reduced purchase price, and an extended closing date in exchange for an increased earnest money deposit of $2 million. The third amendment constituted Onni's notice to proceed with the sale barring failure of any condition precedent.

Onni did not pay the balance of the sales price by the time specified in the agreement and in May 2020 it declared the agreement canceled. As justification, Onni cited the consequences of the global COVID-19 pandemic, which caused a number of economic problems: renters unable to pay rent; public entities enacting moratoria on evictions relieving lessees from their obligation to pay rent; and landlords consequently experiencing significant difficulty in securing rents with no available legal recourse. Onni sought return of its $2 million deposit.

7th Avenue sued Onni for breach of contract and for a judicial declaration of the parties' rights and obligations under the purchase agreement. It alleged Onni claimed the COVID-19 pandemic excused its performance due to a material adverse change in the property's condition, and due to commercial frustration and impracticability. 7th Avenue asked

---

[2] In its statement of facts, Onni suggests that the writer of Onni's e-mail, its lead negotiator Daniel Bell, specifically discussed entitlements or appurtenances as "part of the 'Property' being purchased." Onni states that Bell "communicated to [7th Avenue] that the value of what [Onni] was purchasing was defined by, among other things, the speed of the ability to build (given that entitlements and permits were in place) as well as the fact that the purpose of the property being purchased was to construct a rent generating structure." This characterization is unsupported by the record. Bell's e-mail expresses concern about increased affordable housing fees and the fact they would add time to the building permit approval process, and increased structural costs due to a below-ground sewer pipe. He does not use the terms entitlements or appurtenances, or refer to the purchase agreement's definition of "property."

the court to declare that Onni's obligation to close the transaction was not excused.

The matter proceeded to trial, with the parties briefing whether Onni was entitled to a jury. 7th Avenue argued a jury trial was not warranted; that the material adverse change clause unambiguously permitted termination "only if there was a material adverse change in the physical condition of the Property or if there was a loss or impairment of the entitlements associated with it," but even if the clause was ambiguous, there was no conflict in the extrinsic evidence. Onni asked for a jury trial on the issue of the purchase agreement's interpretation. It argued a contract's interpretation became a jury question in the face of disputed extrinsic evidence as to an ambiguous clause. Onni argued that if 7th Avenue took the position that the agreement's material adverse change clause was limited to the raw land, "this is a position of ambiguity, and there most certainly will be disputed extrinsic evidence on which way this should be interpreted." It argued that whether there was a material adverse change was a disputed fact question. Onni also argued that a jury should determine whether its performance was excused by various affirmative defenses. After considering the parties' arguments, the trial court ruled the matter was appropriate for a bench trial.

7th Avenue presented evidence via several witnesses, including Bell, 7th Avenue's listing real estate broker Timothy Winslow, and 7th Avenue's chief financial officer, Steve Shamoun.

Bell testified that Onni was purchasing a ready-to-go, entitled and permit-ready development site that would allow Onni to build and profit off the project approved by the permits. He gave his understanding of the meaning of some of the purchase agreement's terms, including its definition

6

of "property."[3]  He testified he viewed the material adverse change provision as giving Onni the right to terminate the contract in the event it was unable to finance the project or "any other thing that [Onni] investigated."  He agreed that in Onni's view, a material adverse change occurred because the property went "from being capable of development, to being incapable of development" due to Onni being unable to obtain financing due to the pandemic.  According to Bell, "broadly the economic condition of the property had been materially adversely changed."  Bell agreed that Onni was buying the property and its appurtenances, which he understood to include the "opportunity, the development, the land use approval, . . . the ability to build a building and obligation to build certain things and collect rent."[4]

Winslow was involved in negotiating the basic terms of the deal with Bell via a series of letters of intent.  He testified that after the pandemic hit and Onni notified it of its termination of the deal, Bell tried to negotiate a lower price for the project.  Winslow also testified that he brokered a separate downtown multi-family project that did not terminate due to the pandemic.  On cross-examination, Winslow explained he prepared an offering

---

[3]     Bell confirmed that in discovery he had initially stated under oath he was unaware of any ambiguity in the purchase agreement, but later changed his answer, stating it was ambiguous.  Whether the agreement is ambiguous, that is, reasonably susceptible to Onni's interpretation, is a question of law (*Horath v. Hess* (2014) 225 Cal.App.4th 456, 464), so this testimony is of no moment.

[4]     At the same time, Bell conceded that Onni's ability to borrow money was not an appurtenance or otherwise within the meaning of property as defined in the purchase agreement.  He also conceded that the term "property" did not include the status of the economy, credit markets, or Onni's ability to finance the property.  Bell agreed during his deposition that the pandemic did not cause any permits or entitlements to expire or be revoked.

7

memorandum before putting the property up for sale. That document described the property as well as the rental units that would be permitted on it. The offering memorandum included floor area ratio information, which a developer would use to determine the amount of space that could generate rents. It included information about other finished apartment buildings and what rents per square foot their owners were collecting from tenants. Winslow testified that he prepared a due diligence file available to prospective buyers (what he termed a "war room") that included the offering memo, the entitlement document, and copies of permits. 7th Avenue had also prepared a proforma, which represents the value of the property including prospective rents and expenses. But Winslow did not recall having any communications with any potential buyer about the prospective rent they would earn if they purchased the property. He received Onni's letter of intent, from which he understood Onni was requiring the opportunity to inspect the property's physical, environmental, title, zoning and economic conditions. Winslow testified that at no time in his dealings with Bell from his first call through the agreement's signing did they discuss the economics of the structure that would be built under the entitlement. He did not believe they discussed the rents that Onni would be able to recover or earn if it were to build the project, other than what was in the offering memorandum.

Shamoun confirmed that Onni initially drafted the agreement. He testified that neither Onni nor its lawyers ever communicated to him that they viewed the definition of property in the material adverse change clause to encompass the project's potential profitability or speed of development. He testified that if Onni had expressed that view, 7th Avenue would not have signed the agreement as such matters were out of its control. At the time the parties entered into the agreement, Shamoun understood the assignable

rights and appurtenances to be the demolition and development permits, which the pandemic did not affect. He understood the material adverse change clause to apply only to the property's physical condition and material changes under 7th Avenue's control, but only discussed his understanding with 7th Avenue's own attorneys and could not say whether they communicated his understanding to Onni.

Onni's position, as stated in its trial brief, was that it would "establish that the effects of the pandemic materially and adversely affected the condition of the entitlements, permits, and appurtenances, such that Onni's ability to finance and build, in a speedier time frame, a rent generating structure (as contemplated by these entitlements, permits, and appurtenances) was compromised." It presented testimony from Bell, who conducted Onni's due diligence in connection with the project, and spoke regularly with Winslow during that period. He testified that before Onni submitted its first offer, he had conversations with Winslow focused on the market and financial aspects of the property, including the price. He communicated to 7th Avenue's agent that Onni needed a due diligence contingency to inspect all aspects of the property including financial matters. During the exchange of letters of intent, the main term was price; the parties did not negotiate the agreement's due diligence language. Onni included the material adverse change clause in the agreement's initial draft because it viewed the clause as a favorable, broad term that memorialized the transaction, so Onni had a way to deal with material changes in it. Bell did not specify a pandemic or stock market crash in the material adverse change clause because it was "about as broad as can be." He understood the material adverse change clause to give Onni the right to terminate the contract if there was a material adverse change in any of the things Onni had been

9

inspecting as part of its due diligence.[5] Bell testified his understanding was not consistent with 7th Avenue's position—expressed in attorney letters after the agreement's termination—that the condition precedent to Onni's performance was satisfied as the material adverse change clause referenced only the property's physical condition.

Bell also testified that the conditions in March, April and May of 2020 would have made it "very challenging" and "near impossible" to construct the mixed use project contemplated by the development permit issued for the property (which Bell referred to as the entitlement), without tenants having an obligation to pay rent, and with retail space being unable to open. He testified the pandemic impacted the development permit's requirement that the permittee have a minimum of 265 dedicated tenant parking spaces and common outdoor open space areas, stating that without tenants no one would be parking or using the open space, but the permittee would still have the "costs and all the obligations that you think you pay for parking garages." As for required common indoor space, Bell testified Onni would not have been able to use it; "all these amenities and the gyms had to be locked down during Covid." He testified Onni would not be paying development impact fees on mixed use property it could not lease or tenants could not open, and Covid's

---

5    Bell was asked: "What is—what are Onni's rights as you understand them when signing this agreement as to the conditions of the property on the date due diligence closes?" He answered: "*I think we said all along* this is what the [material adverse change] condition referenced. If there was a material adverse change and any of these things that we had been inspecting then we had the right to terminate [*sic*]. It was a condition precedent. I mean it was, it was in the event it was not satisfied." (Italics added.) Though the italicized portion might suggest Bell communicated his belief to 7th Avenue or its agents, Onni admits on appeal that "[t]he parties did not have any communications about what the [material adverse change] clause was intended to mean . . . ."

10

impact on the supply chain would be "very impactful on the construction cost."

Following the presentation of evidence, the court found 7th Avenue had proven Onni breached the agreement, and there was insufficient evidentiary support for the factual premises of Onni's invocation of the material adverse change clause. It found Onni's concerns about securing loans to pay for the property and collecting rent after construction were not within the scope and meaning of the material adverse change clause; it agreed with 7th Avenue's interpretation of the material adverse change clause "as including alterations in the real property itself and damage to, modification of, or alteration of physical appurtenances on the property . . . ." It found "[t]he economic conditions caused by the pandemic, as Onni perceived them, do not constitute material adverse changes to either the real property or its appurtenances, consistent with this definition." It rejected Onni's reliance on the due diligence clause to show economic success was a material condition of the contract. The court ruled there was no evidence of a material adverse change in the property's condition justifying Onni's termination of the agreement. It found the material adverse change clause unambiguous, but ruled that even if it was ambiguous, its interpretation would cut against Onni, which drafted the clause with its counsel. The court ruled Onni failed to prove its affirmative defenses. Based on the liquidated damages provision, it awarded 7th Avenue Onni's $2 million deposit plus accumulated and prejudgment interest from the May 13, 2020 date of Onni's termination. It determined 7th Avenue was the prevailing party entitled to costs and contractual attorney fees.

Onni filed this appeal.

11

DISCUSSION

## I. *Principles of Contract Interpretation*

Because the main issues raised on appeal involve the meaning of the purchase agreement, particularly the material adverse change clause, we set out principles of contract interpretation that guide our review. These principles also assist our review of Onni's contention that the trial court violated its right to a jury trial, discussed next.

Courts review the interpretation of a contract de novo, "according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) "The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract." (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 916, citing *Hartford Casualty Insurance Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; Civ. Code,[6] § 1636; see also *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195 (*Continental*); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473–474 (*City of Atascadero*).) The intent is assessed according to objective, rather than subjective, manifestations of the parties' intent at the time of contracting, " 'including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties.' " (*SLPR, L.L.C. v. San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 299; *Horath v. Hess, supra,* 225 Cal.App.4th at p. 463; *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432;

---

[6]     Undesignated statutory references are to the Civil Code.

*City of Atascadero*, at p. 474.)  Undisclosed personal beliefs or intentions of the parties are not competent extrinsic evidence.  (*Brant v. California Dairies* (1935) 4 Cal.2d 128, 133 [defendant's testimony as to his personal belief of what contract meant was "incompetent and inadmissible"]; *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587 ["[m]utual assent to contract is based upon objective and outward manifestations of the parties; a party's 'subjective intent, or subjective consent, therefore is irrelevant' "].)

The court looks first to the agreement's language to determine the parties' intent, if possible.  (§ 1639; see *Continental*, *supra*, 55 Cal.4th at p. 195.)  If the language is clear and explicit, it governs judicial interpretation.  (§ 1638; *Continental*, at p. 195; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1263; *Gilkyson v. Disney Enterprises, Inc.*, *supra*, 66 Cal.App.5th at p. 916.)  The words are to be understood in their ordinary and popular sense rather than according to any strict legal meaning, unless the parties used the words in a technical sense or unless a special meaning is given to them by usage.  (§ 1644; *Continental*, at p. 196; *People ex rel. Lockyer*, at p. 1263; *City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 248; see Code Civ. Proc., § 1861.)

We consider the contract as a whole and strive to give effect to every part, if possible, with each clause helping to interpret the other.  (§ 1641; *City of Atascadero*, *supra*, 68 Cal.App.4th at p. 473.)  "Courts must interpret contractual language in a manner which gives force and effect to *every* provision, and not in a way which renders some clauses nugatory, inoperative or meaningless."  (*City of Atascadero,* at p. 473.)  And a " 'contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.' "  (*Mountain Air Enterprises, LLC v.*

*Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752, citing Civ. Code, § 1647; see also *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531.)

When contract language is ambiguous, that is, susceptible of more than one reasonable interpretation, extrinsic evidence may be considered not to vary or modify the terms of the agreement, but to aid the court in ascertaining the true intent of the parties. (*Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 865.) "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37; *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8.) " 'The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review.' " (*Iqbal*, at p. 8.) But " ' "[l]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' " (*Continental*, *supra*, 55 Cal.4th at p. 195.)

## II. *Right to a Jury Trial*

Onni contends the trial court deprived it of its constitutional right to a jury trial on the issue of the purchase agreement's interpretation. Whether Onni was constitutionally entitled to a jury trial is a pure question of law we assess de novo. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 23; *Berg v. Pulte Home Corp.* (2021) 67 Cal.App.5th 277, 289.)

Onni contends a jury trial was necessary on the material adverse change clause's interpretation because there was conflicting extrinsic

14

evidence on its meaning.  It points out 7th Avenue offered testimony from Winslow that during negotiations the parties did not discuss the economic viability of the project or financial gain Onni might expect from it.  It claims its conflicting evidence was Bell's testimony that Onni considered a material adverse change clause a favorable term to include in every draft purchase agreement, which sellers usually removed.  Onni goes on to admit, however, that "[t]he parties did not have any communications about what the [material adverse change] clause was intended to mean . . . ."  Rather, Onni points to testimony about the agreement's due diligence clause; it says Bell "communicated frequently with [7th Avenue's] agent about the economics of the project and the property's financial condition" and its letter of intent "established that the financial condition of the property was to be evaluated by [Onni] in its due diligence."  Onni argues the agreement's "due diligence [c]lause sets the standard to which the [material adverse change c]lause applies, because it provides [the] Purchaser the 'sole and absolute discretion' to determine 'whether the Property is physically, legally, economically, and operationally satisfactory.' "  Onni suggests that in resolving this question, we must "[r]ead[ ] the due diligence provision alongside the [material adverse change] clause" to "contextualize[ ] the aspects of the [p]roperty's condition that were investigated in [Onni's] due diligence . . . ."  (Some capitalization omitted.)

7th Avenue responds that the sole evidence of the parties' objective manifestations of their intent concerning the material adverse change clause was the purchase agreement itself and the letters of intent from Onni's lawyers preceding the agreement's drafting  It argues Onni presented no admissible disputed extrinsic evidence about the agreement warranting a jury trial; rather, it maintains both Bell and Winslow admitted there were no

15

communications between the parties (or their lawyers) about the material adverse change clause's meaning, and Onni's cited evidence is of Bell's subjective understanding or Onni's practices in other transactions, which is irrelevant to the purchase agreement's interpretation.

A. *Legal Principles*

"[A] suit to recover damages for . . . breach of contract is an action at law in which a right to jury trial ordinarily exists." (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671; *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9; *Caira v. Offner, supra*, 126 Cal.App.4th at pp. 25–26.) But even in legal actions, the right to a jury trial extends only to issues of fact. (*Shaw v. Superior Court* (2017) 2 Cal.5th 983, 993; *Monster, LLC v. Superior Court* (2017) 12 Cal.App.5th 1214, 1225.) Issues of law must be decided by the court. (*Shaw*, at p. 1224.)

Contract interpretation is always a question of law for the court unless it requires resolving conflicts in foundational extrinsic evidence. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 397– 398, 395 (*City of Hope*) [contract interpretation is a legal question "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence"]; *Admiral Ins. Co. v. Superior Court* (2017) 18 Cal.App.5th 383, 387; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 818–819.) "[C]ourts interpret a contract as a matter of law 'even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.' "

(*Oakland*, at p. 819, quoting *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127.)[7]

"[W]hen . . . ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact . . . .' [Citation.]  In other words, if interpreting the contract involves deciding between 'conflicting extrinsic evidence concerning the meaning of . . . contractual provisions,' or 'divergent testimony about what the parties understood certain contractual provisions to mean,' then it is a factual question, not a legal one." (*Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC*, *supra*, 53 Cal.App.5th at p. 819, quoting *City of Hope*, *supra*, 43 Cal.4th at pp. 385, 394–395.)  But " ' "when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract." ' " (*Hewlett-Packard Co. v. Oracle Corp.*, *supra*, 65 Cal.App.5th at p. 531.)

B.  *The Evidence Did Not Warrant a Jury Trial*

We conclude the trial court did not err by declining to submit issues concerning the agreement's interpretation to a jury.  As 7th Avenue points out, Onni does not point to disputed extrinsic evidence of the parties' mutual intentions about the material adverse change clause's meaning, that is *outward* manifestations of their intent on that language, which evidence

_____

[7]     When, as here, an agreement is integrated, extrinsic evidence is not permitted in order to add to, detract from, or vary its terms, but it is admissible in order to explain what those terms are.  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 521; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC*, *supra*, 53 Cal.App.5th at p. 822 [" 'The California Supreme Court . . . permits the admission of extrinsic evidence to interpret the language of an integrated written instrument where such evidence is relevant to prove a meaning to which the contractual language is 'reasonably susceptible.' ' "].)

must shed light on how they understood it *at the time of contracting.* (*SLPR, L.L.C. v. San Diego Unified Port Dist.*, *supra*, 49 Cal.App.5th at p. 299.) Bell did not testify or suggest he related his beliefs about the breadth of the agreement's terms to Winslow or to Onni principals during their negotiations; in fact, as stated, Onni concedes there were no communications between the parties about the meaning of the material adverse change clause, which would include its definition of the term "property." That Winslow may have prepared and shared with prospective purchasers, including Onni, an offering memorandum presenting analysis about rents, floor area ratios, or other financial opportunities in connection with the project is not extrinsic evidence concerning that clause's meaning specifically or the purchase agreement in general, which was drafted by Onni and exchanged after those events.

Onni represents that Bell and Winslow had "multiple, regular conversations . . . about the 'market and the financial aspects' of the offering memorandum and the 7th & A deal." It characterizes Bell's testimony as extrinsic evidence that conflicts with Winslow's testimony. But at the cited portion of the trial record, Bell merely testified that he spoke with Winslow "regularly" *on April 3, 2019*, before Onni submitted its first offer via an April 8, 2019 letter of intent. Bell testified that between the time Onni's principal decided to submit an offer on the property and the time Onni actually submitted its first offer, he spoke with Winslow about "price and substantiating [the price]" as well as "the market and the financial aspects" of the offering memorandum, referring to financial aspects as meaning "underwriting the price." These preliminary conversations taking place before Onni submitted its April 8, 2019 letter of intent are not evidence of the parties' understanding of the later-drafted purchase agreement's language. Notably, neither the agreement's material adverse change language, nor its

18

definition of "property," appear in any of Onni's letters of intent in the record, which merely reference the "Property" as "1333 7th Avenue, San Diego CA." 7th Avenue's response to Onni's letters of intent edited the "property" description as an "[a]pproximately 30,000 square foot parcel located at 1333 7th Avenue, San Diego, CA 92101 (APN 534-052-02 and 03 and 534-033-03)."

Onni also quotes Bell as testifying that for Onni, " 'having an entitlement, we view as a site, that is more or less ready to go. It's an approved project that's gone through what we view to be the most challenging aspects of the development process. It's the right to build a project and the right to collect rent. There is obligations [*sic*] that come with that as well. There is rights and obligations [*sic*] that come with that." Bell was answering a question about his "understanding of what entitlement means in the context of a [r]eal [e]state development similar to what is at issue in this case[.]" He did not testify he related this understanding of the term entitlement to Winslow or any other 7th Avenue agent or principal with respect to this project generally or the purchase agreement specifically.

And Winslow's testimony did not contradict that of Bell; Winslow conceded that Onni expressly demanded the right to examine the property's financial condition during the due diligence period. His testimony was that he did not believe he discussed with Bell rents Onni would be able to recover or earn "other than what may be in the offering memorandum" (some capitalization omitted), consistent with Bell's testimony that such discussions about financial aspects occurred in connection with that document. As stated, competent extrinsic evidence does not include either witness's unexpressed subjective beliefs, which is what Bell testified to, or the parties' posttermination understandings expressed after the dispute arose.

19

As for Onni's right and efforts to decide whether the property was "economically[ ] and operationally satisfactory" under the purchase agreement's due diligence provision, Onni does not point to *disputes* over that evidence. And Onni's contextualization argument—asking to read the material adverse change clause in context with the agreement's due diligence clause—is in substance one of applying legal canons of contract interpretation, not the resolution of conflicting evidence relevant to the parties' mutual intentions about the material adverse change clause's meaning. In sum, the record did not warrant a jury trial to resolve factual conflicts relating to the purchase agreement's interpretation.

### III. *Onni's Challenge to the Judgment*

Onni broadly contends the judgment in 7th Avenue's favor is based on the trial court's incorrect interpretation of the law and factual findings that were not supported by the trial evidence. In its opening brief, it intersperses particular arguments about the nature of the purchase agreement's material adverse change clause and how it impacted the burden of proof, as well as the court's interpretation of that clause, which it acknowledges was a question of law. As we explain, none of the arguments warrant reversal.

### A. *Standard of Review*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Where the trial court draws conclusions of law based upon its findings of fact, we also review those legal determinations de novo. (*Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558; *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.)

20

Under fundamental principles of appellate review, we must presume the judgment is correct, indulge all intendments in favor of the judgment, and require Onni as the appellant to affirmatively demonstrate error. (*Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 872–873.) We view the evidence in the light most favorable to the judgment and resolve all conflicts in its favor. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 574.) Under these standards, "parties challenging a trial court's factfinding bear an ' "enormous burden." ' " (*Id.* at p. 582.)

" '[I]n a bench trial, the trial court is the "sole judge" of witness credibility. [Citation.] The trial judge may believe or disbelieve uncontradicted witnesses if there is any rational ground for doing so. [Citation.] The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review.' " (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 335, quoting *Schmidt v. Superior Court*, *supra,* 44 Cal.App.5th at p. 582.)

B. *Purported Shifted Burden of Proof*

Onni contends that because the material adverse change clause is a condition precedent to the agreement, 7th Avenue bore the burden of proving there had been no material adverse change to the property between the time of the agreement's signing and Onni's termination. It maintains the trial court "effectively" shifted that burden, requiring Onni to prove that no material adverse change had occurred, leaving "unrebutted and unanswered" the various examples of material adverse conditions it assertedly presented at trial via Bell. Onni points to the trial court's remark in its statement of decision that "as a baseline consideration for the analyses of the [material

21

adverse change] provision and Onni's affirmative defenses, the evidence needed to show more than just reasonable 'worries' or 'business concerns.' "

Though Onni objected to the court's statement of decision, it did not raise this objection, which would have given the trial court the opportunity to correct the problem. The contention is forfeited as a result. (Accord, *Yee v. Panrox Internat. (USA), Inc.* (2023) 97 Cal.App.5th 470, 480.) "It is detrimental for parties to store up secret objections they deploy only if they lose and, after much cost and delay, appeal." (*Ibid.*)

Further, the trial court expressly stated that 7th Avenue bore the burden to prove all elements of its breach of contract cause of action, including that "Onni failed to do something that the contract required it to do." At Onni's cited portion of the trial court's ruling, the court discussed whether evidence supported the factual premises Onni had argued were material adverse changes excusing its performance, which also provided the foundation for Onni's affirmative defenses, on which Onni *did* bear the burden of proof. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 469[8] ["Of course, *at trial,* a defendant raising an affirmative defense has the burden of proving it"], citing in part *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794–795.) It ruled those factual predicates (Onni's inability to secure a loan to pay for the property and its difficulty in collecting rents due to the pandemic) were not supported by sufficient evidence but only "relative speculation." We do not view this remark as improperly shifting the breach of contract burden of proof to Onni, particularly where the court correctly referenced 7th Avenue's burden. (*People v. Mataele* (2022) 13 Cal.5th 372, 413–414 [reviewing court presumes lower court properly applied

_____

[8] Disagreed with on other grounds in *San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal.App.4th 308, 315.

22

the law unless the appellant affirmatively shows otherwise], citing *Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.) Application of the material adverse change clause in any event turned on that clause's interpretation, which the court decided as a question of law.

Finally, Onni fails to discuss how the purported shift in the burden of proof prejudiced it, that is, how it is reasonably probable the court would have reached a different result in the absence of the error. (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287.) The court decided as a matter of law that the material adverse change clause did not encompass economic or financial conditions, a result we agree with as discussed below.

C. *The "Practical Construction" Rule*

In addressing some of the canons of contract interpretation, Onni argues the "key principle to be used in this case" is that expressed in *Warner Constr. Corp. v. Los Angeles* (1970) 2 Cal.3d 285. Onni quotes *Warner's* statement that the " 'acts and conduct of the parties with knowledge of [the agreement's] terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court.' " (*Id.* at pp. 296–297, some italics omitted.) Without record citation, Onni says it applied these principles by presenting Bell's and Winslow's testimony "to establish their words and conduct prior to this dispute arising, as to what was intended by the term 'Property' in the [material adverse change c]lause." Elsewhere, it refers to the asserted conversations between Bell and Winslow about the " 'market and financial aspects' of the offering memorandum and the 7th & A deal." It maintains

23

their conversations "confirm that the financial condition of what was to be purchased was material to the deal."[9]

Onni misstates and misapplies the "practical construction" canon. This court stated the relevant principle in *Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791: " 'The conduct of the parties *after execution of the contract* and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.' " (*Id.* at p. 1814, italics added.) In *Warner*, the court emphasized that "[t]he principle of 'practical construction' applies only to *acts performed under the contract* before any dispute has arisen." (*Warner Constr. Corp. v. Los Angeles*, *supra*, 2 Cal.3d at pp. 296–297, italics added; see also *Crestview Cemetery Assn v. Dieden* (1960) 54 Cal.2d 744, 752–753 ["That the actions of the parties should be used as a **r**eliable means of interpreting an ambiguous contract is . . . well settled in our law"]; *Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189 ["conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions"].)

The canon looks not to the parties' words as Onni suggests, but to objective *acts* or *conduct* that reflect their understanding of the contract language and operate as a practical construction. "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' " (*Crestview Cemetery Ass'n v. Dieden, supra*, 54 Cal.2d at p. 754.) Thus, in *Hernandez,* a party's provision of insurance certificates

---

9    In connection with these arguments, Onni contends that Winslow's testimony that he did not discuss economics with Bell is "not credible," and the trial court should not have credited it. To the extent the court considered and credited Winslow's testimony, we may not reassess that decision. "It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 981.)

24

naming another entity as an additional insured and later conduct affirming that entity was an additional insured "constituted a practical construction of the contract's requirements." (*Hernandez v. Badger Construction Equipment Co.*, *supra*, 28 Cal.App.4th at pp. 1816–1817.)

Here, Onni does not identify acts or conduct by the parties after they signed the purchase agreement that would implicate this canon. The conversations it cites between Bell and Winslow about the offering memorandum (discussed in part II, *ante*) took place prior to Onni's initial offer and well before the parties signed the agreement in June 2019. There is no evidence that after Onni and 7th Avenue signed the purchase agreement but before any dispute arose, they conducted themselves in a manner that would constitute a "practical construction of the [material adverse change clause's] requirements." (*Hernandez v. Badger Construction Equipment Co.*, *supra*, 28 Cal.App.4th at p. 1817.) While Onni made efforts to satisfy itself about financial and economic considerations of the deal before disputes arose, those efforts were specifically taken pursuant to the agreement's due diligence provision. Those due diligence efforts do not reflect a practical construction by the parties of the material adverse change clause, and what it meant by a material adverse change in the property's condition warranting termination.

D. *The Trial Evidence of Each Party's Interpretation*

Onni continues with arguments about the trial evidence and how it either assertedly supported its interpretation of the material adverse change

25

clause, or did not support 7th Avenue's interpretation.[10] Onni argues the trial court in its statement of decision disregarded its evidence. Specifically, it maintains the court ignored evidence—the offering memorandum's characterization of the property as a development opportunity, Onni's inspection of financial and economic conditions during the due diligence period, and its negotiation of the third amendment—demonstrating that the property's economic condition was included in the material adverse change clause. Elsewhere, Onni correctly acknowledges that the court interpreted the agreement as a matter of law, and that our review of the court's interpretation is de novo.

Onni's assertions about the trial evidence are misplaced. The trial court in independently interpreting the purchase agreement was entitled to consider solely its words to determine the parties' intent about its meaning, and end its inquiry if the contract language was clear and unambiguous. (*Continental*, *supra*, 55 Cal.4th at p. 195; *State Compensation Insurance Fund v. Department of Insurance* (2023) 96 Cal.App.5th 227, 236 [parties' mutual intent is determined from the contract's writing alone, if possible].) In the absence of ambiguity, the court properly declined to consider extrinsic evidence at all. Even assuming the court believed the record warranted admission of extrinsic evidence to determine whether the purchase agreement was reasonably susceptible to Onni's interpretation, it could still decline to consider evidence irrelevant to the parties' mutual intent, such as their subjective interpretations. It could decline to consider evidence of the

_____

10    Onni points to a May 21, 2020 letter from 7th Avenue's attorneys addressing Onni's termination, as well as Shamoun's testimony at trial about how he subjectively read the material adverse change clause. But as Onni acknowledges, neither is competent extrinsic evidence. Nor is it evidence of the parties' acts or conduct under the agreement pertinent to the "practical construction" rule.

26

parties' remarks or legal arguments made to each other *after* the dispute arose.

In any event, we have already addressed in part II, *ante*, most of the evidence that Onni says supported its own interpretation, including the offering memorandum and Bell and Winslow's conversations about it. That evidence does not reflect their outward manifestations of intent concerning the material adverse change language. Onni cites the letters of intent as contemplating Onni would inspect the property's financial or economic condition as part of its due diligence; but we have already pointed out those do not use the language of the agreement's material adverse change language, its definition of "property," or the words entitlement or appurtenance. Onni refers to its negotiation of the third amendment, but does not explain how that reflects its communicated understanding of the material adverse change clause. Finally, without record citation, Onni appears to reference Bell's subjective undisclosed understanding about the broad scope of the material adverse change clause.

For the reasons discussed, the evidence does not support Onni's assertion that it "communicated and negotiated that the economic and financial conditions were part of what it was purchasing and evaluating prior to [c]losing." As 7th Avenue points out and we have already concluded, the record lacks competent disputed extrinsic evidence of the parties' mutual understanding concerning the material adverse change clause or its definition of "property." The trial evidence about the parties' or their attorneys' respective theories of the agreement's meaning—either undisclosed or shared after disputes arose and Onni sought to terminate the agreement—is irrelevant.

E. *Onni's Assertions About Defining the Term Appurtenance*

The purchase agreement's material adverse change clause provides simply: "On or before the Closing, there shall have been no material adverse change in the condition of the Property." The agreement does not define the phrase "material adverse change" or the word "condition." However, it defines the term "property" by reference to section 2, which specifies what 7th Avenue "agrees to sell" and Onni "agrees to purchase" as "the Real Property, *together with Seller's interest in any assignable rights and appurtenances pertaining thereto, including but not limited to, entitlements, development rights and land use approvals* (the Real Property *and such appurtenances* being sometimes hereinafter collectively referred to as the 'Property')." (Italics added.)

Onni argues "there are two primary ordinary, dictionary definitions of the term 'appurtenance:' (1) rights and (2) arising out of. Because the [purchase agreement] already includes assignable rights immediately before the term appurtenances, defining appurtenances as rights would violate the rules of construction and make the term redundant. Therefore, the logical, ordinary meaning of appurtenance that fits within the rules of construction is something arising out of, or expected from, the Real Property, entitlements, development rights, and land use approvals." Onni says the term property is so "broadly defined" such that it "protects Onni from any material changes of previously inspected conditions between the close of due diligence and [the June 30, 2020 closing date]." It maintains the material adverse change clause "constituted an express, and obvious, limitation on the 'as is' clause, and the 'reliance on own investigation' clauses." According to Onni, if the parties had intended the phrase "condition" to be limited to the property's

28

physical conditions or only those conditions that 7th Avenue controlled, the agreement "would have defined and narrowed the term."

These contentions lack supporting authority, including by any common or legal dictionary reference. For that reason, we may disregard them as forfeited. (*Temple of 1001 Buddhas v. City of Fremont* (2024) 100 Cal.App.5th 456, 483 [party forfeits arguments unsupported by cogent legal argument or citation to authority], citing *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

Because there is no competent extrinsic evidence concerning the purchase agreement's interpretation, we are not bound by the trial court's interpretation. (*Department of Forestry & Fire Protection v. Lawrence Livermore National Security, LLC* (2015) 239 Cal.App.4th 1060, 1066.) We interpret the term appurtenance as a matter of law, starting with its ordinary meaning and looking at it not in isolation, but in context with other parts of the purchase agreement, which was drafted by experienced attorneys for a sophisticated client. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 116 Cal.App.4th at p. 1263 [to "determine a word's 'common meaning, a court typically looks to dictionaries' "].) "[R]eliance on common understanding of language is bedrock" but "equally important are the requirements of reasonableness and context." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867.) We may not look at a contractual clause in isolation but rather we must understand a clause in connection to the contract "as a whole." (*Olson v. Doe* (2022) 12 Cal.5th 669, 680.)

An "appurtenance" has both dictionary and statutory definitions. The statutory definition of an appurtenance to land is in section 662: "A thing is deemed to be incidental or appurtenant to land, when it is by right used with

29

the land for its benefit; as in the case of a way, or water-course, or of a passage for light, air, or heat, from across the land of another." (See also *Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 255 (*Abatti*).) Dictionaries define an appurtenance as (1) an incidental right (such as a right-of-way) attached to a principal property right and passing in possession with it and (2) a subordinate part or adjunct (Merriam-Webster Dict. Online (2024) https://www.merriam-webster.com/dictionary/appurtenance [as of July 25, 2024] archived at <https://perma.cc/BNL9-W7FH>.) or "[a] thing that belongs to another, a 'belonging'; a minor property, right, or privilege, belonging to another more important, and passing in possession with it." (Oxford English Dict. Online <https://www.oed.com/dictionary/appurtenance_n?tab=meaning_and_use#190 98 [as of July 25, 2024] archived at <https://perma.cc/EJB3-6QV3>.) Black's Law Dictionary defines the term as "[t]hat which belongs to something else; an adjunct; an appendage; something annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or other easement to land . . . ." (Black's Law Dic. (6th ed. 1990) p. 103, col. 1; see also *Trask v. Moore* (1944) 24 Cal.2d 365, 368 ["Appurtenances are things belonging to another thing as principal and which pass as incident to the principal thing"].)

In viewing these meanings, we cannot ignore the remaining part of the clause, which states that 7th Avenue is selling the real property as well as its "*interest* in any assignable rights and appurtenances pertaining thereto . . . ." (Italics added.) The agreement goes on to give examples of assignable rights and appurtenances, which "includ[e] but [are] not limited to, entitlements, development rights and land use approvals . . . ." Common

30

appurtenances can include objects or things physically annexed to or incorporated in the realty (see *Bellon v. Silver Gate Theatres, Inc.* (1935) 4 Cal.2d 1, 11 [basement room passed with lease as an incident or appurtenance]), but here include specified kinds of development permits or grants issued for this particular property and benefiting it. Shamoun testified and Bell admitted these permits, grants or entitlements were not affected, extinguished or revoked by the pandemic.

It would strain logic to define appurtenances as including Onni's financial expectations or returns (including, as Onni suggests, its future development costs, the timing/speed of development or the value of anticipated rents and profits, as 7th Avenue itself would have no *interest* in those inchoate expectancies or returns. Rather, under the purchase agreement, 7th Avenue made no representations or warranties about the property's value, income derived, profitability or fitness for a particular purpose, and it expressly stated that Onni had to rely on its own inspection and investigation of those matters ("the property and all documents related thereto"). Once Onni satisfied itself of such financial or economic considerations under the due diligence clause, it purchased the property and its assignable rights and appurtenances "as-is" without regard to income, profitability, value or other economic considerations. In the context of the agreement as a whole, an appurtenance, and by extension, a material adverse change to the property's condition, is not reasonably susceptible to Onni's proposed definition including such matters. It is likewise not reasonably susceptible to Onni's proposed meaning of a material adverse change in the property as encompassing the later inability to use certain features to be built under the development permit (i.e., parking spaces or indoor open

31

space).  Onni's permitted right to build those features did not change, only its fitness (or the future expectations) for such use.

Onni criticizes 7th Avenue's reliance at trial on *Abatti*, *supra*, 52 Cal.App.5th 236, but then itself relies on that case, asserting that *Abatti* "contemplates that inchoate interests, such as 'beneficial' interests are also 'appurtenances' " and thus Onni's "financial expectancies—contrasted from its rights—acquired in the [purchase agreement] constitute a 'beneficial interest' form of appurtenance, even under the otherwise distinguishable *Abatti*." We reject the argument.  In *Abatti* this court issued a limited holding: that farmers within the Imperial Irrigation District possessed an equitable and beneficial interest in that district's water rights, which the district held in trust for its users' benefit.  (*Id*. at p. 247, see also *id*. at p. 260.)  The farmers' interest, this court held, was one of a right to water service "appurtenant to their lands" subject to the district's discretion to "modify service consistent with its duties to manage and distribute water equitably for all categories of users" it served.  (*Ibid*.; see also *id*. at pp. 251, 260.)  Reviewing definitions, we held that " 'appurtenant' denotes that the water right or interest is attached to land, but does not denote its type or scope."  (*Id*. at p. 255.)

*Abatti*'s discussion of the farmer's appurtenant beneficial interest in water service from the irrigation district, a unique and specific context, does not support Onni's claim that an appurtenance extends to expected rents and other anticipated financial gains, or economic benefits and expectations from the development rights granted and sold to it with the property.  In the context of water rights, *Abatti* made clear that "[b]eneficial uses are 'categories of water use," such as irrigation, industrial or aquacultural uses. (*Abatti*, *supra*, 52 Cal.App.5th at p. 256.)  We decline to extend from its

32

limited holding that an appurtenance as used in the purchase agreement here encompasses the sort of inchoate financial expectancies posited by Onni stemming from the development rights, entitlements or land use approvals transferred in the sale.

F. *The Court's Determination Regarding Ambiguity*

Onni does not directly challenge the trial court's conclusion that the purchase agreement is unambiguous. Rather, it contends that the court erred by concluding that if the purchase agreement *were* ambiguous, it would apply the contract rule of interpreting such ambiguities against the drafter. According to Onni, "[t]here is no presumption against a drafter in a negotiated contract." It characterizes the purchase agreement as "extensively negotiated . . . ."[11]

Setting aside its characterization of the evidence, Onni is wrong on the law. The rule is that where canons of statutory construction do not remove uncertainty in contract language, the language "should be interpreted most strongly against the party who caused the uncertainty to exist." (§ 1654 [" 'In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused

---

[11] Onni states: "Rather than simply accepting the [purchase agreement] as prepared by Onni's lawyers, [7th Avenue's] attorneys made several changes to the [purchase agreement], and the parties jointly negotiated the final terms." We see this as overstating the cited testimony. Shamoun testified that Onni's counsel prepared the initial draft, and that the initial draft "went back and forth multiple times between the attorneys . . . ." Bell was asked: "[T]o your knowledge there was nothing communicated during negotiations between Onni and Seventh Avenue about what [the material adverse change] clause was intended to mean, right? He answered: "I am not sure I understand the question. The contract went back and forth a number of times." 7th Avenue's counsel then appears to confirm with Bell that the material adverse change clause did not change from the time it was included in the first draft to the final purchase agreement.

the uncertainty to exist' "]; *City of Hope, supra,* 43 Cal.4th at pp. 397–398; *Steiner v. Davis* (1938) 24 Cal.App.2d 692, 695.)

In *City of Hope*, the California Supreme Court rejected an identical contention made in the context of a jury instruction challenge. The appellant there contended that the rule of interpreting contractual uncertainty against the party who caused it to exist "does not apply to contracts that are the result of negotiations," as was the contract at issue in that case. (*City of Hope, supra*, 43 Cal.4th at p. 397.) The court explained that the jury instruction language was "taken almost verbatim from . . . section 1654," and thus embodied "a general rule of contract interpretation that was applicable to the negotiated agreement between [the parties]." (*City of Hope*, at p. 398.)

Onni's limited argument gives no basis to disturb the trial court's ruling that the purchase agreement is unambiguous. A contract provision will only be considered ambiguous " ' "when it is capable of two or more constructions, both of which are reasonable." ' " (*Another Planet Entertainment, LLC v. Vigilant Ins. Co.* (2024) 15 Cal.5th 1106, 1136.) A term is not ambiguous merely because the contract does not define it. (See *Castro v. Fireman's Fund Am. Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120.) Nor can terms be considered ambiguous because of "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " (*Ibid.*) As we have stated, " 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*State of California v. Continental Ins. Co., supra*, 55 Cal.4th at p. 195; *Another Planet*, at p. 1136.)

G. *Asserted Violation of Canons of Contract Interpretation*

Onni challenges the trial court's interpretation of the purchase agreement's material adverse change clause as violating the principle that courts must interpret contractual language to give effect to each provision, not to render some portions nugatory, inoperative or meaningless. (*City of Atascadero*, *supra*, 68 Cal.App.4th at pp. 473–474.) It contends the court's interpretation of the term property was overly "narrow and unsupported," and rendered other terms within the contractual definition duplicative or meaningless. Specifically, it argues that the examples of appurtenances used by the court "are nothing more than the real property itself," making the definition of property "essentially 'real property' and 'real property.' "

Our conclusion above on the proper interpretation of an appurtenance, which we reach independently, resolves these contentions. But we disagree in any event with Onni's argument about the trial court's ruling, which stated that changes to the real property's condition and " 'appurtenances pertaining thereto' " included damage, alteration, modification or unsuitability of "physical appurtenances on the property, such as . . . adjoining or non-adjoining structures, fences, [and] utility fixtures such as underground pipes, etc." These sorts of physical structures and fixtures are not the "real property itself" as Onni maintains.[12]

For the reasons expressed above, and viewing the purchase agreement as a whole, its definition of property, and thus the meaning of a material

_____

[12] Without explanation, Onni refers to Revenue and Taxation Code section 104 for its definition of "real property." That section, for purposes of property taxation, states that real estate or real property includes "[i]mprovements." (Rev. & Tax. Code, § 104, subd. (c).) Onni does not explain in any meaningful way why this legal definition in the tax context should apply to the purchase agreement in this case or to the sale of real property in general. It does not persuade us to apply this definition.

adverse change in the property's condition, cannot reasonably be construed to include Onni's financial or economic expectancies, returns or considerations. As a result, the trial court correctly concluded Onni had no basis to terminate the contract under that provision by claiming those matters were purportedly affected by the COVID-19 pandemic.

## IV.  *Onni's Assertedly Unrebutted Proof of Material Adverse Conditions Warranting Termination*

Our conclusion about the purchase agreement's proper interpretation resolves Onni's claim that it presented unrebutted proof of material adverse changes to the property's condition (both economic and noneconomic) that warranted judgment in its favor.  Onni argues that "Bell testified as to a variety of conditions that materially and adversely affected the property, including the building entitlement, pandemic eviction moratoria and stay-at-home orders, and the widespread economic uncertainty in the first two quarters of 2020."  But Bell's testimony was not that the development permits or Onni's right to develop the property under them were revoked or altered (he admitted they were not), but that the pandemic assertedly reduced Onni's anticipated tenants and rent generation, or negatively impacted the construction schedule and costs, or rendered useless the indoor, outdoor and parking spaces authorized by the permits.  As we have concluded, the purchase agreement's material adverse change clause did not encompass such economic or financial considerations.

## V.  *Attorney Fees and Costs*

Onni's sole argument about attorney fees is to point out that if it prevails, the attorney fee and cost award should be stricken.  Because we do not disturb the judgment, we leave that award intact.

DISPOSITION

The judgment is affirmed.  7th Avenue shall recover its costs on appeal.


O'ROURKE, Acting P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.